**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 31, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

STACIE CULP; STEPHANIE PETERS,

  Plaintiffs - Appellants,

v.

REMINGTON OF MONTROSE GOLF
CLUB, LLC,

  Defendant - Appellee.

No. 24-1022

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:18-CV-02213-RMR-KAS)**
_____

Damon Davis (J. Keith Killian with him on the briefs), Killian, Davis, Richter &
Fredenburg, PC, Grand Junction, Colorado, for Plaintiffs-Appellants.

Nicholas H. Gower (Karoline M. Henning with him on the brief), Hoskin Farina &
Kampf, PC, Grand Junction, Colorado, for Defendant-Appellee.
_____

Before **HARTZ**, **KELLY**, and **FEDERICO**, Circuit Judges.
_____

**HARTZ**, Circuit Judge.
_____

Remington of Montrose Golf Club, LLC (Remington) operates a golf club and

casual-dining restaurant in Montrose, Colorado. Stacie Culp and Stephanie Peters

(Plaintiffs), both servers at Remington's restaurant, were allegedly harassed by

bartender Jason DeSalvo while all three were employed at Remington. Plaintiffs brought several claims against Remington under both state and federal law. The claims at issue on appeal are for damages under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2(a), 3(a), and the Colorado Anti-Discrimination Act (CADA), C.R.S. § 24-34-402, for sexual harassment and retaliation. The district court granted Remington summary judgment on Ms. Peters's retaliation claim, leaving the other claims for trial. At trial the jury rejected Ms. Peters's remaining claims and returned puzzling special verdicts on Ms. Culp's claims, finding that Remington did not violate her rights under Title VII but nonetheless awarding her punitive damages on a Title VII claim.

Plaintiffs raise several issues on appeal. First, Ms. Peters contends that the district court should not have granted Remington summary judgment on her retaliation claim. We affirm the district court. Second, Ms. Culp contends that her Title VII and CADA claims should be retried because of the inconsistent special verdicts. We agree that a new trial is required, and we discuss whether, in light of Supreme Court precedent that supersedes an earlier precedent of this court, district courts have authority to resubmit special verdicts to the jury. Third, Plaintiffs appeal the district court's rulings on the admissibility of three pieces of evidence under Fed. R. Evid. 403 and 404(b), but these evidentiary challenges were not preserved in district court.

## I.    BACKGROUND

### A.    Factual Background

Remington employed Mr. DeSalvo as a server/bartender and as an assistant floor manager at the restaurant. In June 2017 Ms. Peters and Ms. Culp both began working in the restaurant as servers. Plaintiffs allege that they were sexually harassed by Mr. DeSalvo. Neither woman reported the harassment at first. Ms. Peters told Ms. Culp that Remington management had been dismissive of bullying and harassment in the past. Ms. Culp feared nothing would be done. Seeking to escape the harassment, Ms. Culp applied in late July to return to her former job at Applebee's. When asked by an Applebee's manager why she wanted to leave Remington, Ms. Culp mentioned that she had been experiencing sexual harassment.

Word of Ms. Culp's complaint got back to Remington management. Remington's General Manager Eric Feely, Remington's Food and Beverage Manager Rick Crippen, and Remington's Human Resources and Marketing Director Beth Feely met with Ms. Culp during her shift. Ms. Culp reported the harassment she had experienced and jotted down a brief statement on a piece of paper.

Remington began an investigation conducted by Mr. and Ms. Feely. Although Remington's lawyer encouraged Mr. Feely to interview all employees, he limited his interviews to 10 female servers, including Ms. Peters. Each interviewee was asked just two questions: "Is there anything inappropriate around Jason DeSalvo that you would like to disclose or talk about[?]"; and "Is there anything you would like to add?" Aplt. App., Vol. II at 486. The interviewees were not specifically asked

whether they witnessed any inappropriate interactions between Ms. Culp and Mr. DeSalvo, and Mr. Feely asked no follow-up questions, even when interviewees mentioned harassment or other inappropriate conduct.

One interviewee stated that Mr. DeSalvo "speaks about other servers' asses" and had caused a female employee to quit. *Id.* at 504. Another interviewee admitted that she had "[h]eard of him touching others" inappropriately. *Id.* at 509. Ms. Peters said that Mr. DeSalvo had asked her and another employee for drinks at his house, that she had witnessed him sexually harassing others, and that he had been "overtly sexual verbally with underage girls, and they were visibly very uncomfortable." *Id.*, Vol. V at 1174.

The Feelys never re-interviewed Ms. Culp after their brief initial conversation. In fact, Mr. Feely declined to perform any follow-up interviews, despite the Remington lawyer's recommendation to the contrary, purportedly because Mr. Feely and Remington's majority owner, Bobby (Lew) Thompson, thought they had enough to terminate Mr. DeSalvo—although Mr. Feely began to think that "a lot of the comments from [Ms. Culp] were false." *Id.*, Vol. II at 466. After the Feelys concluded their investigation, Remington suspended Mr. DeSalvo for five days without pay and demoted him from assistant floor manager to bartender. In addition, Remington put him on probation for 30 days, warning him in writing that management would be "evaluat[ing] his work performance," and cautioning that "[d]uring this period of time, there [could not] be any valid documented complaints from fellow employees or customers." *Id.*, Vol. I at 158.

Page 4

Plaintiffs claim that Remington retaliated against them for reporting Mr. DeSalvo. Ms. Culp alleges that her hours were reduced. She resigned shortly thereafter. Ms. Peters alleges that Remington inadequately investigated her complaint and retaliated against her by assigning her to work with Mr. DeSalvo after he returned from his suspension. Upon his return to work, Mr. DeSalvo allegedly refused to fill Ms. Peters's drink orders, cursed at her, and shoved her. Ms. Peters went to Mr. Feely's office and complained about having been put on the same shift as Mr. DeSalvo. Mr. Feely allegedly responded: "Gosh, Steph, do we have to do this every week?" *Id.*, Vol. V at 1188. Ms. Peters immediately left the restaurant and never returned to work.

### B.    Procedural History

Plaintiffs filed suit in the United States District Court for the District of Colorado against Remington for (1) hostile-work-environment sexual harassment under Title VII and CADA; (2) retaliation for engaging in protected conduct, in violation of Title VII and CADA; and (3) tortious negligent supervision and retention under Colorado common law. Remington moved for summary judgment on all claims. The district court granted summary judgment on Ms. Peters's retaliation claim but otherwise denied the motion.

Plaintiffs proceeded to trial on their remaining claims. The jury found against them on each of their claims but, inconsistently, awarded Ms. Culp punitive damages on a Title VII claim. The district court resolved the inconsistency by setting aside the punitive-damages award.

Page 5

On appeal Ms. Peters challenges the summary judgment on her retaliation claims, Ms. Culp contends that the district court erred in how it dealt with the jury's inconsistent verdict, and Plaintiffs challenge three evidentiary rulings. We begin with Ms. Peters's retaliation claims.

## II.    DISCUSSION

### A.    Ms. Peters's Retaliation Claims

Ms. Peters contends that the district court erred in granting summary judgment to Remington on her retaliation claims under Title VII and CADA. The court's decision was based on the ground that Ms. Peters did not suffer a materially adverse employment action. We affirm the district court.

Ms. Peters argues on appeal that Remington took two materially adverse actions against her: (1) Remington "conduct[ed] a half-hearted investigation" of Plaintiffs' complaints, Aplt. Br. at 57, and (2) it placed her on the same shift as Mr. DeSalvo after he returned from his suspension. We review de novo a grant of summary judgment by the district court under Fed. R. Civ. P. 56(a), applying the same standards that govern that court's review. *See Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 461 (10th Cir. 2013). In applying Rule 56(a), "[w]e must view facts in the light most favorable to the non-moving part[y] . . . , resolving all factual disputes and reasonable inferences in their favor." *Id.* (internal quotation marks omitted). Summary judgment is proper if "there is no genuine dispute as to any material fact" and the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Because CADA retaliation claims must satisfy the same standards as Title VII retaliation claims, *see Lindsay v. Denver Pub. Sch.*, 88 F.4th 1323, 1327 (10th Cir. 2023), we consider both claims together. "Title VII's antiretaliation provision forbids employer actions that 'discriminate against' an employee (or job applicant) because [s]he has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) (quoting 42 U.S.C. § 2000e-3(a)). "[T]he antiretaliation provision . . . is not limited to discriminatory actions that affect the terms and conditions of employment." *Id.* at 64. But the challenged action must be "materially adverse." *Id.* at 68. An employer action is materially adverse if "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (internal quotation marks omitted). We "examine claims of adverse action through a case-by-case approach, examining the unique factors relevant to the situation at hand." *McGowan v. City of Eufala*, 472 F.3d 736, 742 (10th Cir. 2006) (internal quotation marks omitted).

We thus ask whether Remington's actions would have dissuaded a reasonable person in Ms. Peters's position from making or supporting a charge of discrimination. We begin with Ms. Peters's claim that the sheer inadequacy of Remington's investigation into Plaintiffs' allegations was materially adverse.

This argument is foreclosed by circuit precedent. We have held that an employer's failure to investigate an internal discrimination complaint cannot support a retaliation claim absent a showing of demonstrable harm. *See Daniels v. United*

Page 7

*Parcel Serv., Inc.,* 701 F.3d 620, 640–41 (10th Cir. 2012), *abrogated on other grounds by Muldrow v. City of St. Louis, Mo.*, 601 U.S. 346 (2024). The complainant in *Daniels* alleged that her employer never followed up with her after she filed an internal complaint. *See id.* at 640. She claimed that her employer's "failure to investigate was intended to dissuade her from pursuing the complaint." *Id*. Following the lead of the Second Circuit in *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 721–22 (2d Cir. 2010), we rejected the claim, explaining that "a failure to investigate a complaint, unless it leads to demonstrable harm, leaves an employee no worse off than before the complaint was filed." *Daniels*, 701 F.3d at 640. "[A]dopting a contrary rule and finding a failure to investigate establishes a prima facie case of retaliation would open employers to retaliation claims even where they failed to investigate because of a good faith belief the complaint was meritless." *Id*.

If failing to investigate a complaint of discrimination altogether is not, without more, a materially adverse action, then surely neither is inadequately investigating a complaint. Ms. Peters does not allege that Remington's investigation left her any "worse off than before [her] complaint was filed." *Id.*  Instead, she argues only that Remington's investigation was materially adverse because it was "dismissive" of her allegations. Aplt. Reply Br. at 28. But dismissiveness is not "demonstrabl[y] harm[ful]" in and of itself. *Daniels*, 701 F.3d at 640. "[P]etty slights, minor annoyances, and simple lack of good manners" are not materially adverse actions. *White*, 548 U.S. at 68. Ms. Peters has failed to explain how the inadequate investigation did anything more than inconvenience her.

Page 8

Ms. Peters's other claimed materially adverse action presents a closer question. After Ms. Peters reported the harassment, Remington continued scheduling her to work when Mr. DeSalvo was also on duty. Intentionally scheduling an employee to work with her harassing coworker could well be a materially adverse action in some circumstances. But context matters. A review of timesheets reveals that in the summer of 2017, Mr. DeSalvo regularly worked four or five evenings a week, and Ms. Peters almost always worked evenings. After Mr. DeSalvo returned to work, Ms. Peters could not have been given much work without her shifts overlapping with his. Perhaps recognizing this, Ms. Peters did not request any change in her schedule to avoid him. Indeed, there is no evidence that Remington changed its scheduling practices upon Mr. DeSalvo's return to work. *See Cooper v. Smithfield Packing Co., Inc.*, 724 F. App'x 197, 202 (4th Cir. 2018) (inaction on the part of the employer—failing to transfer either the victim or the alleged harasser to different departments—was not an adverse employment action). And given the significant punishment Mr. DeSalvo had received, including the 30-day probation, Remington management had no reason to believe he would promptly revert to misbehavior that would put his employment at risk.

In light of Remington's limited ability to keep Ms. Peters and Mr. DeSalvo on separate shifts, treating the scheduling of Ms. Peters as a materially adverse action would be to require Remington to have fired Mr. DeSalvo or greatly reduced his hours as punishment for his misbehavior. But requiring employers to impose the harshest possible punishment as an initial sanction for an employee's misconduct

would be inconsistent with the Supreme Court's pragmatic approach to Title VII, which counsels against unnecessary burdens on employers. *Cf. Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998) (Title VII's "basic policies of encouraging forethought by employers and saving action by objecting employees" requires that employers be entitled to an affirmative defense to vicarious liability if they "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise"); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998) (same); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 358–59 (2013) (rejecting a lower causation standard for retaliation claims in part because "[i]t would be inconsistent with the structure and operation of Title VII to so raise the costs, both financial and reputational, on an employer whose actions were not in fact the result of any discriminatory or retaliatory intent"). The significant sanctions imposed on Mr. DeSalvo were a reasonable response to his harassment. And a reasonable employee would not be deterred from reporting discriminatory conduct when the employer takes reasonable action in response. We therefore hold that the scheduling of Ms. Peters and Mr. DeSalvo was not a materially adverse action.

Because neither of Remington's actions was materially adverse, we affirm the district court's grant of summary judgment.

Page 10

B.    **Inconsistent Jury Verdict**

The jury was inconsistent in completing the verdict form for Ms. Culp's claims. It concluded that Ms. Culp had not proved her sex-discrimination or retaliation claims, yet found that Remington had acted with malice or reckless indifference to her federal rights in discriminating or retaliating against her and awarded punitive damages. The district court tried to eliminate the inconsistency by rejecting the jury's award of punitive damages on the ground that the verdict form had instructed the jury not to consider punitive damages if it did not find discrimination or retaliation. Ms. Culp challenges that ruling and argues that the district court should have either awarded her the punitive damages or ordered a new trial.

We hold that a new trial is required. But to avoid such unfortunate results in the future, we revisit circuit precedent in light of a more recent Supreme Court decision that would permit such inconsistent verdicts to be dealt with by telling the jury to reconsider its verdict after receiving further instructions.

1.    *Proceedings in district court*

The verdict form for Ms. Culp's claims, with the jury's answers, is reproduced below:

We, the jury, being duly impaneled and sworn upon under oath, do unanimously present our verdict as follows:

**SEXUAL HARASSMENT - HOSTILE WORK ENVIRONMENT**

1. Did Ms. Culp prove by a preponderance of the evidence that Remington subjected her to a hostile work environment based on her sex (sexual

Page 11

harassment) in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Colorado Anti-Discrimination Act ("CADA"), as described in Jury Instruction Nos. 22 through 29?

ANSWER:          YES _____          NO ___X___

*If you answered "No" to Question No. 1, **do not answer** Question No. 2 and instead skip to Question No. 3. If you answered "Yes" to Question No. 1, **answer** Question No. 2.*

2. What is the amount of damages, if any, that Ms. Culp proved by a preponderance of the evidence that she suffered as a result of the hostile work environment (sexual harassment) in violation of Title VII and CADA?

SEXUAL HARASSMENT DAMAGES:          $ _____

**RETALIATION**

3. Did Ms. Culp prove by a preponderance of the evidence that Remington retaliated against her for reporting alleged unlawful sexual harassment to Remington, with such retaliation violating Title VII and CADA, as described in Jury Instruction Nos. 30 through 34?

ANSWER:          YES _____          NO ___X___

*If you answered "No" to Question No. 3, **do not answer** Question No. 4 and instead skip to Question No. 5. If you answered "Yes" to Question No. 3, **answer** Question No. 4.*

4. What is the amount of damages, if any, Ms. Culp proved by a preponderance of the evidence that she suffered as a result of the retaliation in violation of Title VII and CADA that are different from and in addition to any damages you found in Question No. 2 above?

RETALIATION DAMAGES:          $ _____

**PUNITIVE DAMAGES**

*Only answer Question 5 if you answered "Yes" to either Question No. 1 or Question No. 3.*

5.  Did Ms. Culp prove by a preponderance of the evidence that Remington violated her rights, either by sexually harassing her or by retaliating against her, with malice or reckless indifference to her right to be free of such intentional discrimination, as described in Jury Instruction No. 38?

ANSWER:          YES __X__          NO _____

*If you answered "No" to Question No. 5, **do not answer** Question No. 6 and instead skip to Question No. 7. If you answered "Yes" to Question No. 5, **answer** Question No. 6.*

6.  What is the amount of punitive damages, if any, that you chose to award to punish Remington for misconduct and to provide a warning to others?

PUNITIVE DAMAGES:                    $ ____125,000____

**NEGLIGENT SUPERVISION OR RETENTION**

7.  Did Ms. Culp prove by a preponderance of the evidence that Remington negligently supervised or retained Mr. DeSalvo, as described in Jury Instruction Nos. 39 through 41?

ANSWER:          YES _____          NO __X__

*If you answered "No" to Question No. 7, **do not answer** Question No. 8 and instead skip to question No. 9. If you answered "Yes" to Question No. 7, **answer** Question No. 8.*

8.  What is the amount of damages, if any, Ms. Culp proved by a preponderance of the evidence that she suffered as a result of negligent supervision or retention that are different from and in addition to any damages you found in Question Nos. 2 and 4 above?

NEG. SUPERVISION & RETENTION DAMAGES $ _____

**TOTAL DAMAGES**

*Only answer Questions [sic] No. 9 if you answered "Yes" to Question Nos. 1, 3, and/or 7.*

9.  For only the claims for which you answered "Yes" to Question Nos. 1, 3, and/or 7, what is the total damages (not punitive damages) that Ms. Culp has proven that she suffered that were caused by Remington's conduct?

TOTAL DAMAGES (Not Including Punitive Damages) $ _____

Aplt. App., Vol. III at 818–21.[1]

The jury acted contrary to the instructions in the verdict form and awarded Ms. Culp punitive damages even though it found no Title VII violation. The award not only violated the instructions but was also contrary to law. Punitive damages may be awarded in Title VII actions *only if* a plaintiff proves that her employer "*engaged in a discriminatory practice or discriminatory practices* with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1) (emphasis added). Thus, Ms. Culp could not recover punitive damages unless she prevailed on either her sexual harassment or her retaliation claim. Proof of a Title VII violation was a necessary predicate for any punitive damages.

The judge and lawyers promptly recognized the problem. As the trial judge was dismissing the jury, Remington's lawyer asked to approach the bench and the following colloquy ensued:

> **[Remington's Lawyer]**: I don't know what that actually – they shouldn't have answered the question.
> **The Court**: Right.

---

[1] Because the district court and the parties have all characterized the verdict form as a special-verdict form and because it closely resembles the form we characterized as a special-verdict form in *Bonin v. Tour West, Inc.*, 896 F.2d 1260, 1262 (10th Cir. 1990), we will treat the verdict here as a special verdict and not a general verdict with interrogatories, although we acknowledge that, in practice, the two can be "virtually indistinguishable." *Floyd v. Laws*, 929 F.2d 1390, 1395 (9th Cir. 1991); *see id.* at 1395–96 (stating that because, "[a]s a general rule, the [district] court has complete discretion over whether to have the jury return a special verdict or a general verdict," the verdict form "in this case constituted a special verdict, simply because that is what the trial court declared [it] to be").

**[Remington's Lawyer]**: Do we just skip it or –
**The Court**: Well, it seems to me that that is something that we will take up in briefing and motions afterwards – or discussions afterwards.
**[Ms. Culp's Lawyer]**: So there seems that there may be some inconsistency. How do you award punitive damages when you don't find –
**The Court**: I don't think you can. I think that would be – that the judge will have to enter a verdict after the jury has been dismissed.
**[Remington's Lawyer]**: Understood.
**The Court**: All right. (Hearing continued in open court.) With that, ladies and gentlemen, you may retire to the jury room. I'll be in forthwith. [Jury exits.]
**The Court:** All right. It does appear that we will need some additional briefing and argument with regard to a verdict here where the jury has indicated an amount for punitive damages but did not award compensatory damages on any of the claims. They should not have answered that question. I will accept briefing on any motions that the parties wish to submit by next Friday at 5:00 p.m. And we will – we'll rule on that at that time."

Aplt. App., Vol. VI at 1426–27.

In posttrial briefing, Remington argued that the punitive-damages award was surplusage and could be disregarded because the jury had ignored the verdict form's instructions. Ms. Culp argued that the verdict could be reconciled in her favor because the jury's award of punitive damages implied that it did in fact find a Title VII violation, notwithstanding its answers to the contrary. She said that the jury might have reasonably awarded punitive damages because of the ambiguous and misleading instructions. For one, the jury could have misconstrued Instruction No. 44, which instructed that it "may award damages only once for the same damages," to mean that it could "award noneconomic damages for negligent supervision or retention, noneconomic damages for hostile work environment (violating Title VII and CADA) or punitive damages for hostile work environment (violating Title VII and CADA) but could not award damages for more than one of the perceived claims." *Id.*, Vol. IV at 874. She argued that this potential

misunderstanding was likely exacerbated by the fact that the punitive-damages questions were formatted in the same way as those for the claims for relief in the verdict form. Ms. Culp also argued that the jury might not have read the instruction telling it to answer the punitive-damages questions only if it answered *yes* to either Question 1 (sexual harassment) or Question 3 (retaliation) because this instruction appeared *above* Question 5 (punitive damages), and the instruction after Question 3 told the jury to skip to Question 5 if it answered Question 3 in the negative. According to Ms. Culp, these ambiguities, taken together, could have made the jurors "believe that there were three claims under Title VII and CADA: (1) hostile work environment, (2) retaliation, and (3) punitive damages," and that they could award damages on only one of the three. *Id.* at 878. Ms. Culp further contended that the jury's punitive-damages award was legally valid because the jury had found a Title VII and CADA violation by implication in answering *yes* to Question 5.

The district court rejected Ms. Culp's argument. It disregarded the jury's award of punitive damages and entered judgment in favor of Remington. The court stated two grounds. First, it held that it could harmonize the jury's answers. It compared the jury's answers to those in *Freeman v. Chicago Park District*, 189 F.3d 613 (7th Cir. 1999). In that Title VII case the jury answered *yes* when asked whether the plaintiff was harassed, yet answered *no* when asked whether the plaintiff was harassed because of her race. *See id.* at 615. When asked how much in damages she suffered as a result of harassment, the jury answered "$45,000." *Id.* The district court struck the damages award. *See id.* The Seventh Circuit affirmed, holding that the

verdict was not inconsistent because "[t]he jury found that the plaintiff was harassed (apparently for reasons other than those protected by Title VII)." *Id.* at 616. The district court here came to a similar conclusion, reconciling the jury's answers on the ground that "the jury found that Culp was sexually harassed and retaliated against but apparently for reasons other than those protected by Title VII." Aplt. App., Vol. IV at 1022.

Second, the district court ruled that the verdict could be reconciled because the jury's punitive-damages award was mere surplusage. It relied on four out-of-circuit opinions suggesting that "[s]uperfluous answers, proffered in violation of [the] trial court's instructions, are not part of [the] special verdict and must be disregarded as surplusage." *Floyd v. Laws*, 929 F.2d 1390, 1397, 1404 (9th Cir. 1991) (jury answered "no" to question asking whether plaintiff was damaged as a result of the defendant's actions but then answered the next question, which it was instructed not to consider, asking what amount of money would reasonably compensate plaintiff for defendant's actions, by stating "$7500"); *see Kavanaugh v. Greenlee Tool Co.*, 944 F.2d 7, 10 (1st Cir. 1991) ("Where, as here, the complaining party, whether tacitly or explicitly, accedes to the written instructions on the special verdict form and to the companion directions included in the charge to the jury, and interposes no objection to the jury's inconsistent responses until after the jury has been discharged, the district court may exercise its discretion to reject special verdicts which the court, with the agreement of all parties, correctly instructed the jury not to answer."); *White v. Grinfas*, 809 F.2d 1157, 1161 (5th Cir. 1987) ("[I]f the district court has correctly

found that the jury's answer to a question that was supposed to terminate further inquiry is clear and disposes of the legal issues, on review we must ignore the jury's necessarily conflicting answers to any other questions[.]"); *cf. Carr v Wal-Mart Stores, Inc.*, 312 F.3d 667, 673–75 (5th Cir. 2002) (district court abused its discretion in denying motion for new trial by relying on answer to interrogatory that jury should not have considered). Here, the district court held that since the jury ignored the written instructions on the verdict form when it answered the punitive-damages questions, the jury's answers to these questions were superfluous and could be disregarded.

## 2.    *Discussion*

"We review a district court's refusal to grant a new trial based on a finding that the jury verdict is not inconsistent for abuse of discretion." *Domann v. Vigil*, 261 F.3d 980, 983 (10th Cir. 2001). "It is the additional burden of the appellant to show that any verdict inconsistency demonstrates either confusion or abuse on the jury's part." *Id.* (internal quotation marks omitted).

When considering whether there has been an abuse of discretion, we must review the district court's decision in light of the constitutional imperative that courts not "improperly invade[] the function and province of the jury." *Gallick v. Balt. & O.R. Co.*, 372 U.S. 108, 113 (1963). "It is the jury, not the court, which is the fact-finding body." *Id.* at 115. It is therefore "the duty of the courts to attempt to harmonize the [jury's] answers, if it is possible under a fair reading of them." *Id*. at 119. "In determining whether there is any inconsistency, we must accept any

reasonable explanation that reconciles the jury's verdict." *Domann*, 261 F.3d at 983. We cannot, however, reconcile a verdict if the jury's answers are "logically incompatible, thereby indicating that the jury was confused or abused its power." *Johnson v. ABLT Trucking Co., Inc.*, 412 F.3d 1138, 1144 (10th Cir. 2005) (internal quotation marks omitted). Purporting to "reconcile" a verdict in that circumstance does not safeguard the jury's preeminent role as fact-finder but instead coins a verdict that the jury did not render, substituting a court's predilections for the jury's confusion.

A few Tenth Circuit cases set the table. In *Cheney v. Moler*, 285 F.2d 116, 119 (10th Cir. 1960), we reversed the district court's denial of the plaintiff's motion for a new trial because the jury's verdict was irreconcilably inconsistent. The plaintiff had sued the defendant for injuries sustained during a fight, and the defendant counterclaimed against the plaintiff for his own injuries. *See id.* at 117. The jury returned a verdict for the plaintiff on his claim, and a verdict against the defendant on his counterclaim. *See id*. But even though the plaintiff lost an ear in the fight and suffered considerable medical expenses, the jury awarded him no damages. *See id.* at 118. On appeal we concluded that these verdicts were not reconcilable because they "reflect[ed] a lack of understanding upon the part of the jury and show[ed] that the jury either returned an erroneous verdict or did not understand their duty to assess damages if a determination of liability was intended." *Id.* It made no sense for the jury to find for the plaintiff on both verdicts, and yet to award him *no damages* for his missing ear. *See id.*

In *Bonin v. Tour West, Inc.*, 896 F.2d 1260, 1263 (10th Cir. 1990), we reversed the district court's denial of the plaintiffs' motion for a new trial because "[a] reading of the entire special verdict form submitted to the jury here shows that the jury's answers are inconsistent and cannot be reconciled." The plaintiffs had sued to recover damages for injuries they sustained during a raft trip conducted by Tour West. *See id.* at 1261. On the verdict form the jury answered *no* when asked whether Tour West was negligent in causing the accident that injured the two plaintiffs. *See id.* at 1262. Yet when asked to apportion negligence by degree, the jury found Tour West to be 10% at fault with respect to the first plaintiff, and 5% at fault with respect to the second plaintiff. *See id.* The district court attempted to reconcile the verdict on the ground that the apportionment of "a small degree of negligence [was] . . . not inconsistent with the definitive initial finding by the jury that defendant was not negligent." *Id.* We reversed because it was impossible for the jury to have found the defendant both *not* negligent and *partially* negligent. *See id.* at 1263.

And in *Danner v. International Medical Marketing, Inc.,* 944 F.2d 791, 794 (10th Cir. 1991), we affirmed the district court's determination that the jury's verdicts were irreconcilably inconsistent, but reversed the district court's ruling that a new trial was not required. Danner agreed to sell all the stock in his company to International Medical Marketing, Inc. (IMM). *See id.* at 792. But IMM struggled to make the agreed-upon payments to Danner. *See id.* Danner eventually declared a default, repossessed the stock from the escrow agent, and brought an action against IMM for payment on its promissory note. *See id.* at 792–93. IMM counterclaimed for

wrongful repossession of the stock, and for failure to preserve the value of the stock. *See id.* at 793. "Under the jury instructions, in order for Danner to prevail, he had to show that IMM defaulted on the note. In contrast, in order for IMM to prevail on its counterclaim for wrongful repossession, it had to prove that it had *not* defaulted . . . . The jury could not properly find for both parties, although that is what it did." *Id.* at 794. After the district court determined that the verdicts conflicted, it proceeded to grant judgment notwithstanding the verdict to Danner because it presumed that the jury filled out the verdict form on Danner's claim first. *See id.* The second verdict form could therefore be disregarded since it could not logically coexist with the first. *See id.* We reversed and remanded for a new trial. *See id.* As we explained, "Although the verdicts were numbered sequentially, neither the district court judge nor the judges on this court can know how or in which order the jury reached its verdicts. Thus, the resolution of this issue cannot depend merely on the numbering of the verdict forms." *Id.*; *see also Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 853–54 (10th Cir. 2000) (holding that jury's special verdict was irreconcilably inconsistent because the jury found that race was a motivating factor in the *company's* failure to promote the plaintiff (thereby holding the company liable), and yet found that race was *not* a motivating factor in the *manager's* decision not to promote, when the manager was the person actually making the decision (thereby holding the manager not liable). The court could not "read the collective mind of the jury and determine why it answered the special verdict form in the way that it did" and declined to prioritize one answer over the other).

Page 21

In contrast, we affirmed the district court's reconciliation of an allegedly inconsistent verdict in *Johnson*, 412 F.3d at 1145. Johnson sued ABLT Trucking for severe injuries he suffered as a result of a car accident with an ABLT driver, bringing claims of negligence and negligence per se. *See id.* at 1140. The jury awarded Johnson more than $400,000 for medical expenses and past and future economic loss but did not award any damages for noneconomic loss (pain and suffering). *See id.* at 1141. ABLT moved for a new trial on the ground that it was inconsistent for the jury to award "substantial medical expenses and lost wages" but to find "no pain, suffering, or disability." *Id.* (internal quotation marks omitted). The district court denied the motion, *see id.*, and we affirmed, *see id.* at 1146. We explained that "[i]t is not metaphysically impossible for a plaintiff to incur future economic losses without corresponding noneconomic losses such as pain and suffering or mental anguish." *Id.* at 1144–45. And under Kansas law, which governed the claims, one can "recover damages for loss of future earning capacity without an award of damages for pain and suffering, even when the loss of earning capacity is caused by pain," because "if the plaintiff's injuries cause pain that prevents him from working, the appropriate damage award is an award for loss of earning capacity." *Id.* at 1145. Thus, at least under Kansas law, the verdicts were not inconsistent with one another. *See id.* at 1145–46.

Turning to the verdict at issue here, the jury found both that Ms. Culp did not prove that Remington had violated her Title VII rights, and that she should be

awarded punitive damages predicated on these nonexistent violations. These findings are inconsistent on their face.

The district court attempted to resolve the conflict by ignoring the punitive-damages verdict. It provided two rationales. Neither is persuasive. First, the district court relied on the approach adopted in *Freeman*, 189 F.3d at 616, where the court said that the jury could consistently find that the defendant had not harassed the plaintiff in violation of Title VII but also find that the defendant had harassed the plaintiff with damages in the amount of $45,000. *See id.* at 615. The court explained that the jury could plausibly have found that the plaintiff was harassed, just not because of some personal characteristic (such as race) protected by Title VII. *See id.* at 616. Citing *Freeman* in support, the district court concluded that "the Culp verdict form can be reconciled because, when it answered Question 5, the jury found that Culp was sexually harassed and retaliated against, but 'apparently for reasons other than those protected by Title VII.' *See Freeman*, 189 F.3d at 616." Aplt. App., Vol. IV at 1022.

We cannot agree. In *Freeman* the question was only whether there could be harassment that was not, say, racial or sexual harassment. *See* 189 F.3d at 616. That question was easy to answer. Here, however, the jury's affirmative answer to the punitive-damages question *required* it to find sexual harassment or retaliation violating Title VII. Question 5 asked the jury:

> Did Ms. Culp prove by a preponderance of the evidence that Remington violated her rights, either by sexually harassing her or by retaliating

against her, with malice or reckless indifference of her right to be free of such intentional discrimination, as described in Jury Instruction No. 38?

Aplt. App., Vol. III at 819–20. If the jury's affirmative answer to Question 5 was based on sexual harassment, that answer cannot be reconciled with its negative answer to Question 1, the sexual-harassment question, which required the jury to find that "Remington subjected [Ms. Culp] to a hostile work environment based on her sex (sexual harassment) in violation of Title VII." *Id.* at 818. Since Question 1 so defines *sexual harassment*, we cannot see how the jury could plausibly have found that Remington "violated [Ms.Culp's] rights . . . by sexually harassing her," *id.*, at 819, "for reasons other than those protected by Title VII," Aplt. App., Vol. IV at 1022. *See* Instruction No. 22 (stating elements necessary to prove "claim of hostile work environment"), Aplt. App., Vol. III at 791.

Likewise, if the jury's answer to Question 5 was based on retaliation, that answer cannot be squared with its negative answer to Question 3, the retaliation question. Question 5 instructed the jury to find liability for punitive damages if Remington "violated [Ms. Culp's] rights . . . by retaliating against her . . . as described in Jury Instruction No. 38." *Id.* at 819–20. That instruction states in relevant part: "In order to find the Defendant liable for punitive damages, you must find that the Defendant discriminated in the face of a perceived risk that its actions *would violate federal law.*" *Id.* at 807 (emphasis added). But the only federal law referenced in the jury instructions was Title VII. *See Id.* at 791 (Instruction No. 22, stating: "The plaintiffs have alleged that they were subjected to a hostile work

environment based upon sex in violation of the [sic] Title VII of the Civil Right Act of 1964"); *see also id.* at 770, 800, 802 (Instructions No. 1, No. 31, and No. 33, referencing Title VII). And perhaps more tellingly, Title VII was the only federal law referenced in the verdict form.[2] The jury's affirmative answer to Question 5 could therefore have rested *only* on a finding that Remington violated Ms. Culp's rights under Title VII, either by sexually harassing her or retaliating against her.

In sum, the jury's verdict cannot be reconciled. The jury's finding of liability for punitive damages in Question 5 simply cannot logically coexist with its finding of no Title VII violation in Questions 1 and 3. Answering Question 5 affirmatively *necessitated* finding a violation in either Question 1 or 3. The jury's answers "destroy each other." *Johnson*, 412 F.3d at 1144 (internal quotation marks omitted). We have consistently held that this kind of conflict in a jury's verdict is not reconcilable. *See, e.g., Cheney*, 285 F.2d at 118 (holding that it is irreconcilably inconsistent to find liability but award no damages when there is clear injury to the prevailing party because such verdicts are "a nullity under the circumstances"); *Bonin*, 896 F.2d at 1263 (holding that it is irreconcilably inconsistent for a jury to find that a defendant

---

[2] Question 1 defined *sexual harassment* in terms of Title VII, asking whether Ms. Culp had proved that "Remington subjected her to a hostile work environment based on her sex (sexual harassment) *in violation of Title VII of the Civil Rights Act of 1964 ("Title VII")* and the Colorado Anti-Discrimination Act ("CADA"), as described in Jury Instruction Nos. 22 through 29?" *Id.* at 818 (emphasis added). And Question 3 did the same, asking whether Ms. Culp had proved that "Remington retaliated against her for reporting alleged unlawful sexual harassment to Remington, *with such retaliation violating Title VII* and CADA, as described in Jury Instruction Nos. 30 through 34?" *Id.* at 819 (emphasis added); *see also* Questions 2 and 4 (referencing damages suffered as a result of a violation of Title VII).

**Page 25**

is both not negligent and partially negligent); *Oja v. Howmedica, Inc.*, 111 F.3d 782, 791–92 (10th Cir. 1997) (vacating a jury's verdicts as facially inconsistent because one verdict required the jury to find "that the PCA hip was defective at the time of sale and caused [plaintiff's] injuries," while another verdict required it "to find that the PCA hip was either not defective at the time of sale or did not cause her injuries").

In contrast to *Freeman*, here it is not plausible that the jury thought that it was imposing punitive damages for some alternative form of sexual harassment or retaliation not covered by Title VII. *See Johnson*, 412 F.3d at 1144 (If there is no "plausible theory that supports the verdict," we cannot affirm the judgment).

We next turn to the district court's surplusage argument. Relying on out-of-circuit case law, the district court concluded that the jury's award of punitive damages could be disregarded as mere surplusage because the jury violated the written instructions on the verdict form by answering the punitive-damages questions.

Again, we respectfully disagree with the district court. To begin with, there is a real possibility that the jury thought it was obeying the court's instructions when it completed the special-verdict form. First, because of some peculiarities of the verdict form, the jury may not have realized that it should answer Question 5 only if it answered Question 1 or 3 in the affirmative. Immediately after the yes/no answer boxes to Question 3, the form states: "*If you answered "No" to Question No. 3, **do not answer** Question No. 4 and instead skip to Question No. 5.*" Aplt. App., Vol. III

**Page 26**

at 819. If one then immediately jumps to the "5" on the verdict form, one reads the punitive-damages question. To be sure, on the line before the "5," the form states, "*Only answer Question 5 if you answered "Yes" to either Question No. 1 or Question No. 3*." *Id.* But this instruction appears to be inconsistent with the instruction after the answer to Question 3. A confused jury might decide that the way to reconcile the two instructions is to go from the answer for Question 3 directly to Question 5 without reading the intervening material, which includes the contradictory instruction.

Jury Instruction No. 44 may also have contributed to the jury's misunderstanding. That instruction states: "If you find for the plaintiff on more than one claim for relief, you may award her damages only once for the same damages." *Id.* at 813. Although the final page of the verdict form, entitled "**TOTAL DAMAGES**," should have cleared up any ambiguity,[3] the jury may not even have *read* the total-damages question because the form instructed it not to answer that question if it answered *no* to Questions 1, 3, and 7. The jury could therefore have understood Instruction No. 44 to allow it to award damages only once. The verdict form has one line for "**SEXUAL HARASSMENT DAMAGES**," another line for "**RETALIATION DAMAGES**," a third line for "**PUNITIVE DAMAGES**," a fourth

---

[3] Under the "**TOTAL DAMAGES**" header, the form instructs: *Only answer Questions* [sic] *No. 9 if you answered "Yes" to Question Nos. 1, 3, and/or 7.*" *Id.* at 821. Question No. 9 reads: "For only the claims for which you answered "Yes" to Question Nos. 1, 3, and/or 7, what is the total damages (*not punitive damages*) that Ms. Culp has proven that she suffered that were caused by Remington's conduct?" *Id.* (emphasis added). The jury was then provided a space upon which to write the total dollar amount of the damages.

line for "**NEG. SUPERVISION & RETENTION DAMAGES**," and, on the final page, a line for "**TOTAL DAMAGES**." *Id.* at 819–21; *see Steward Software Co., LLC v. Kopcho*, 275 P.3d 702, 711 (Colo. App. 2010), *rev'd on other grounds by* 266 P.3d 1085 (Colo. 2011) (noting potential for confusion with similar instruction). Such a misreading by the jury could have led to its decision to enter an amount only for punitive damages.

In any event, there is no debating that the answers on the special-verdict form are inconsistent. And we decline to simply ignore as surplusage an answer that is inconsistent with a previous answer. *See Danner*, 944 F.2d at 794 ("[N]either the district court judge nor the judges on this court can know how or in which order the jury reached its verdicts."). We cannot know that the jury did not address punitive damages first, particularly if it thought that it could award only one class of damages.

More definitively, we specifically rejected the surplusage approach in *Bonin*, 896 F.2d at 1263. We explained there that "disregard[ing] the jury's answers to all but questions 1 and 2 would be to treat those two questions as general verdicts. . . . The answers to those twelve questions must be read together to arrive at the appropriate judgment on the special verdict." *Id.* In this circuit, if we "cannot enter judgment without choosing between the conflicting findings of fact and thereby overturning one of them," then the verdict is not reconcilable. *Johnson*, 412 F.3d at 1144.

Even if we could choose to follow those courts that adopt a surplusage approach to inconsistent verdicts, we would not be inclined to do so. The point is not

to achieve some technical purity in construing the verdict. The guiding light, at least in this circuit, is whether the jury's special-verdict answers "indicat[e] that the jury was confused or abused its power." *Id.* (internal quotation marks omitted). When, as here, there is no plausible way to reconcile the jury's answers to the special interrogatories, we must conclude that the jury was confused or abused its power and therefore order a new trial. To do otherwise would risk "invad[ing] the province of the jury by disregarding factual findings." *Id.*; *see, e.g., Heno*, 208 F.3d at 854 (refusing to disregard one of the jury's answers to a special verdict and instead remanding for a new trial so as not to "intrude on the province of the jury"). "The Seventh Amendment right to a jury trial precludes entry of a judgment based on an inconsistent jury verdict that thereby disregards any material jury finding." *Johnson*, 412 F.3d at 1144 (internal quotation marks omitted). Such an entry may "run afoul of the Seventh Amendment by allowing the District Court to usurp the jury's function." *Id.* (internal quotation marks omitted).

The jury's verdict on Ms. Culp's hostile-work-environment and retaliation claims is irreconcilably inconsistent with its award of punitive damages. We reverse the district court's denial of Ms. Culp's motion for a new trial on these claims.[4] Because Ms. Culp's common-law negligent-supervision claim is not affected by the inconsistency, we leave the jury's verdict on that claim untouched.

---

[4] For the same reason, we reject Ms. Culp's request that we reconcile the jury's verdict in her favor by allowing the punitive damages award to stand.

### 3.    *Preservation and a way forward*

There is one more issue we must address before we conclude the discussion of the inconsistent special verdicts—namely, preservation. Having to retry this case is unfortunate. That result could have been avoided if the district court had resubmitted the matter to the jurors with further instructions so that any misconceptions could be resolved. Ordinarily, we would place the burden on the appellant to have brought the issue to the district court's attention and request resubmission to the jury. Why, then, do we permit Ms. Culp to seek appellate relief on this issue when she did not do so?

The answer is precedent. Under prior decisions of this circuit, the court could not resubmit special verdicts to the jury for clarification. And because the district court could not resubmit special verdicts, we have allowed injured parties to appeal even if they did not preserve the matter in district court by making a futile objection before the jury was discharged. *See Bonin*, 896 F.2d at 1263 ("Rule 49(a) does not require a party to object to the inconsistencies in the jury's answers to a special verdict before the jury is discharged in order to preserve his right to challenge the inconsistencies in a subsequent motion or on appeal."). Under that precedent, we do not require Ms. Culp to have preserved in district court the inconsistent-verdict arguments she makes in this court.

We now describe how we got to that place. We then discuss a Supreme Court decision postdating our controlling precedent which opens the door to resubmitting inconsistent special verdicts to the jury. Resubmission will free district judges from having to make impossible attempts to reconcile inconsistent verdicts and will reduce

the number of unnecessary retrials. Perhaps Ms. Culp could have invoked that Supreme Court decision in this case, but the law in this circuit had been settled to the contrary for some time. We therefore exercise our discretion to overlook any failure to preserve the error raised on appeal. *See Planned Parenthood of Kan. & Mid-Mo. v. Moser*, 747 F.3d 814, 837 (10th Cir. 2014) (Waiver "binds only the party, not the court. . . . [I]t is well-settled that courts have discretion to raise and decide issues sua sponte, even for the purpose of reversing a lower-court judgment.") Counsel in the future, however, should not count on such an exercise of discretion.

We first addressed the issue of sending inconsistent special verdicts back to the jury in *Bonin*, 896 F.2d at 1263. The defendant asserted that the plaintiffs had waived the right to contest any inconsistencies in the jury's special verdict because they "failed to object before the jury was dismissed." *Id*. at 1262. We disagreed. *See id*. We said that although inconsistencies in general verdicts governed by Fed. R. Civ. P. 49(b) must be objected to before the jury is discharged, the rule is different when the court gives "the jury a special verdict in the form described in Rule 49(a)." *Id*. at 1263. We reasoned that Rule 49(a) "does not require a party to object to the inconsistencies in a jury's answers to a special verdict" because, "[u]nlike Rule 49(b), Rule 49(a) does not contain a specific direction to send the jury back for further deliberations in the event of an inconsistency in the jury's answers."[5] *Id*.

---

[5] Rule 49 provides in full:

**(a) Special Verdict.**

(1) *In General.* The court may require a jury to return only a special verdict in the form of a special written finding on each issue of fact. The court may do so by:
  (A) submitting written questions susceptible of a categorical or other brief answer;
  (B) submitting written forms of the special findings that might properly be made under the pleadings and evidence; or
  (C) using any other method that the court considers appropriate.
(2) *Instructions.* The court must give the instructions and explanations necessary to enable the jury to make its findings on each submitted issue.
(3) *Issues Not Submitted.* A party waives the right to a jury trial on any issue of fact raised by the pleadings or evidence but not submitted to the jury unless, before the jury retires, the party demands its submission to the jury. If the party does not demand submission, the court may make a finding on the issue. If the court makes no finding, it is considered to have made a finding consistent with its judgment on the special verdict.

(b) **General Verdict with Answers to Written Questions.**
(1) *In General.* The court may submit to the jury forms for a general verdict, together with written questions on one or more issues of fact that the jury must decide. The court must give the instructions and explanations necessary to enable the jury to render a general verdict and answer the questions in writing, and must direct the jury to do both.
(2) *Verdict and Answers Consistent.* When the general verdict and the answers are consistent, the court must approve, for entry under Rule 58, an appropriate judgment on the verdict and answers.
(3) *Answers Inconsistent with the Verdict.* When the answers are consistent with each other but one or more is inconsistent with the general verdict, the court may:
  (A) approve, for entry under Rule 58, an appropriate judgment according to the answers, notwithstanding the general verdict;
  (B) direct the jury to further consider its answers and verdict; or
  (C) order a new trial.
(4) *Answers Inconsistent with Each Other and the Verdict.* When the answers are inconsistent with each other and one or more is also inconsistent with the general verdict, judgment must not

We later made explicit what was implicit in *Bonin*. We held that the textual difference between Rule 49(a) and Rule 49(b) not only relieves parties in cases involving special verdicts from the obligation to object to inconsistencies, but also precludes district courts from resubmitting special verdicts altogether. *See Johnson*, 412 F.3d at 1141–42 ("Based on the lack of specific direction in [Rule 49(a)], we concluded that the court lacked authority to resubmit a special verdict . . . ."). Although we expressed discomfort with Rule 49 as so interpreted, we were bound to adhere to circuit precedent. *See id.* at 1142 n.1.

Of course, this panel, too, is ordinarily bound by circuit precedent. *See Jimenez v. Sessions*, 893 F.3d 704, 710 (10th Cir. 2018) ("We are generally bound by prior panel precedent."). But we are even more tightly bound by Supreme Court precedent. We need not, and should not, adhere to a circuit precedent that has been overruled or undermined by later Supreme Court authority. *See id.* (holding that we are no longer bound by circuit precedent "when the Supreme Court issues an intervening decision that is contrary to or invalidates our previous analysis" (internal quotation marks omitted)). That is the present situation.

The supervening authority relevant here is the Supreme Court opinion in *Dietz v. Bouldin*, 579 U.S. 40 (2016). That case held that a district court "has the inherent power to rescind a jury discharge order and recall a jury for further deliberations after identifying an error in the jury's verdict." *Id.* at 42. The jury had returned a "legally

---

be entered; instead, the court must direct the jury to further consider its answers and verdict, or must order a new trial.

impossible" verdict. *Id.* at 43 (internal quotation marks omitted). Although the parties stipulated that the plaintiff suffered damages of $10,136 and the "only disputed issue at trial for the jury to resolve was whether [the plaintiff] was entitled to damages *above* $10,136," the jury returned a verdict awarding the plaintiff $0 in damages. *Id.* (emphasis added). The judge discharged the jury, but a few minutes later, upon realizing the error in the verdict, ordered the clerk to bring the jurors back to the courtroom. *See id.* After questioning the jurors to confirm that none had spoken to anyone else about the case, the judge recalled the jury. *See id.* at 44. The judge explained the error in the verdict to the jurors and "ask[ed] them to [return the next morning and] start over with clarifying instructions." *Id.* The next day, the jury returned a new verdict awarding the plaintiff $15,000. *See id.*

The Supreme Court held that the judge had inherent power to recall the jury even though that power was not specifically set out in the Federal Rules of Civil Procedure. *See id.* at 45. "[A] district court possesses inherent powers that are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Id.* (internal quotation marks omitted). The exercise of such power, however, "must be a reasonable response to a specific problem" and must not "contradict any express rule or statute." *Id.* at 46.

The district court's action in the case satisfied those two requirements. "First, rescinding a discharge order and recalling the jury can be a reasonable response to correcting an error in the jury's verdict in certain circumstances." *Id.* After all, "[i]n

the normal course, when a court recognizes an error in a verdict before it discharges the jury, it has the express power to give the jury a curative instruction and order them to continue deliberating." *Id.* (citing Fed. R. Civ. P. 51(b)(3), which states that "[t]he court . . . may instruct the jury at any time before the jury is discharged"). Thus, "[t]he decision to recall a jury to give them what would be an identical predischarge curative instruction could be, depending on the circumstances, similarly reasonable." *Id.* "Second, rescinding a discharge order to recall a jury does not violate any other rule or statute." *Id.* at 47. Although Rule 51(b)(3) says that a court "may instruct the jury at any time before the jury is discharged," "there is no implicit limitation in Rule 51(b)(3) that prohibits a court from rescinding its discharge order and reassembling the jury." *Id.* at 47–48. Nor does any other rule prohibit rescinding a discharge order. *See id.* at 48.

*Dietz* undermines this court's precedent in two ways: (1) it interpreted Rule 51(b)(3), which authorizes the trial court to instruct a jury at any time before the jury is discharged, to permit the court to ask a jury that has not been discharged to reconsider a questionable verdict; and (2) it held that in some circumstances a court may even recall a *discharged* jury and ask it to reconsider its verdict. Although *Bonin* reasonably interpreted Rule 49 in itself as not allowing reconsideration of a special verdict, *see* 896 F.2d at 1263, we did not consider Rule 51 or the possibility of an inherent judicial power to ask the jury to reconsider its verdict. Thus, the difficulties of this case should rarely arise in the future. If the district court has concerns about the inconsistency of a jury's verdicts, it may ask the jury to reconsider. It need not

struggle to determine whether there is some way to reconcile apparently inconsistent verdicts. Moreover, if a party does not point out the problems with the verdict to the court and request jury reconsideration, it forfeits the issue on appeal. We would reverse the district court only if the complaining party establishes that there was a clear error that prejudiced it.

## C. Evidentiary Rulings

Although the problem with the special verdicts requires a new trial on some issues, it does not affect the verdicts in favor of Remington on Ms. Peters's claims and on Ms. Culp's negligent-supervision claim. We therefore must address Plaintiffs' challenges on appeal to three evidentiary rulings, which could have affected the verdicts on those claims. As it turns out, however, the merits of those challenges are not properly before us.

### 1. *Ms. Peters's later employment*

Ms. Peters argues that the district court erred in ruling that if she pursued ongoing emotional-distress damages, Remington could introduce evidence that she worked as an exotic dancer after she left Remington. But we need not resolve that issue because it was not adequately preserved below.

In her complaint Ms. Peters sought to recover damages for emotional harm—"severe emotional distress, mental pain and suffering, inconvenience, fear, anxiety, embarrassment, [and] humiliation"—suffered after she left Remington as a result of her experience there. Aplt. App., Vol. I at 32. She did not seek any economic damages for lost pay post-Remington. As trial approached, Remington indicated that

Page 36

it would seek to admit evidence of Ms. Peters's work as an exotic dancer to rebut her claim for postemployment emotional damages. In particular, it sought to admit a contract Ms. Peters signed as a condition of her employment with one employer in which she agreed not to be offended by, among other things, "advances by customers," "depictions or portrayals of a sexual nature," and "similar types of behavior." *Id.*, Vol. IV at 1129.

Ms. Peters sought to exclude the evidence in two motions in limine. *See* 21 Charles Alan Wright and Kenneth W. Graham, Jr., *Federal Practice and Procedure: Evidence* § 5037.10 (2d ed. 2005) (a motion in limine is a motion "made before or during trial[] to exclude anticipated prejudicial evidence before the evidence is actually offered." (internal quotation marks omitted)). She first filed a motion before trial seeking to exclude the evidence as irrelevant under Fed. R. Evid. 401, as impermissible character evidence under Fed. R. Evid. 404(b), and as unfairly prejudicial under Fed. R. Evid. 403. The district court denied the motion without prejudice, with leave to raise the issue at trial.

Ms. Peters objected again at trial before she testified. She argued that because she was not claiming lost earnings, evidence of her subsequent exotic dancing was not relevant and should not be admitted. The court rejected Ms. Peters's argument, ruling that unless she withdrew her claim for postemployment emotional damages, the evidence could come in to rebut her claim for ongoing emotional damages, but with a jury instruction that the evidence could not "be used to determine whether or not she was actually sexually harassed while she was employed at The Remington,

[or] whether she incurred emotional distress or other damages during the time period in which she was at The Remington." Aplt. App., Vol. IV at 1104–05. Ms. Peters filed a motion to reconsider but with like result. She then announced that she was waiving her claim for postemployment emotional damages. Her subsequent employment as an exotic dancer therefore did not come into evidence at trial.

We do not address the merits of Ms. Peters's claim because she did not preserve her objection for appeal. The Supreme Court confronted a similar issue in *Luce v. United States*, 469 U.S. 38, 39 (1984). The trial court there ruled that if the defendant testified, the government could impeach him with his prior conviction under Fed. R. Evid. 609(a). *See id*. at 39–40. The defendant chose not to testify and sought to appeal the trial court's ruling. *See id.* at 40. The Court held that the defendant had waived his right to appeal the issue because he had not testified. *See id.* It noted that "[a]ny possible harm flowing from a district court's *in limine* ruling permitting impeachment by a prior conviction is wholly speculative." *Id.* at 41. Perhaps, after further development of the evidence at trial, the court might have changed its mind on admissibility, or the defendant might have decided not to testify for other reasons, or the government might have chosen not to use the conviction to impeach defendant after all. *See id.* at 42. And "[e]ven if these difficulties could be surmounted, the reviewing court would still face the question of harmless error." *Id.* Without the court's knowing what evidence would have come in had the defendant testified, "almost any error would result in the windfall of automatic reversal; the appellate court could not logically term 'harmless' an error that presumptively kept

the defendant from testifying." *Id.* "Requiring that a defendant testify in order to preserve Rule 609(a) claims will enable the reviewing court to determine the impact any erroneous impeachment may have had in light of the record as a whole; it will also tend to discourage making such motions solely to 'plant' reversible error in the event of conviction." *Id.*

We recognize that *Luce* is not on all fours with the present case. The evidentiary rule in issue here is not Rule 609(a) and the in limine ruling by the court in this case appears more definitive than the ruling in *Luce*. But the rationale underlying the Court's ruling applies more broadly. The en banc Seventh Circuit has well expressed the point. In the context of a Rule 403 objection, it addressed conditional rulings, in which a trial court indicates how it will rule on an issue (such as whether to admit evidence of later employment) if a certain condition is satisfied (such as the plaintiff's continuing to pursue a claim for future emotional damages):

> One good example of a conditional ruling is a judge's statement that, if a litigant testifies, then the adverse party will be entitled to cross-examine in such-and-such a way. Until the condition has been satisfied by the testimony, the ruling has no effect. It is impossible to determine on appeal whether the ruling made a difference unless the witness does testify and the unfavorable evidence is admitted; what is more, there is a risk that the witness did not plan to testify even if the ruling had been favorable, but sought only to create an issue for appeal. In circumstances like this, the litigant must satisfy the condition in order to present the claim on appeal.

*Wilson v. Williams*, 182 F.3d 562, 565 (7th Cir. 1999) (en banc).

Other courts have adopted the same rationale and have refused to review

conditional rulings if the appellant did not satisfy the condition at trial.[6] Thus, Ms.

---

[6] *See United States v. Goldman*, 41 F.3d 785, 788 (1st Cir. 1994) ("Although *Luce* involved impeachment by conviction under Rule 609, the reasons given by the Supreme Court for requiring the defendant to testify apply with full force to the kind of Rule 403 and 404 objections that are advanced by Goldman in this case."); *Palmieri v. Defaria*, 88 F.3d 136, 140–41 (2d Cir. 1996) (refusing to review a trial court's in limine ruling excluding evidence as irrelevant in part because the appellant sought interlocutory appeal through dismissal and therefore "willingly gave up [the] option" to have "[a]ny purported error in the ruling . . . addressed at trial."); *U.S. v. Ortiz*, 857 F.2d 900, 904–05 (2d Cir. 1988) (declining to review trial court's ruling that the defendant's prior conviction would be admitted under Rule 404(b) if counsel chose to pursue a certain theory of the case; counsel had elected "to forgo" the theory "in order to keep from the jury evidence of the prior conviction," so "the effect of the court's decision" therefore "remained inchoate, its consequences unknowable"); *Gov't of V.I. v. Fonseca*, 274 F.3d 760, 764–65 (3d Cir. 2001) (refusing to review trial court's in limine ruling that defendant's medical records could be used by the government if the defendant testified, because the defendant did not testify); *Walden v. Georgia-Pac. Corp.*, 126 F.3d 506, 518 n.10 (3d Cir. 1997) (the rationales underlying *Luce* apply "when the evidence is challenged as irrelevant or prejudicial [under Rule 401 or 403]"); *United States v. Prigge*, 830 F.3d 1094, 1097–98 (9th Cir. 2016) (extending *Luce* to in limine rulings under Rule 404(b) because district courts "need[] the context of the trial to evaluate the probative value and prejudice of Rule 404(b) evidence" and because "the party seeking to introduce other act evidence under Rule 404(b) may always decide not to do so at trial, or the court may change its mind, so any harm is speculative unless the evidence is admitted"); *Coursen v. A.H. Robins Co.*, 764 F.2d 1329, 1342 (9th Cir.), *opinion corrected*, 773 F.2d 1049 (9th Cir. 1985) (refusing to review the trial court's in limine ruling that evidence of plaintiffs' sexual history could come in at trial because plaintiffs refused to proceed to trial after the in limine ruling and the court therefore had "no way of knowing what sexual history evidence would have been offered at trial" and was "unwilling to engage in . . . speculation"); *United States v. Hall*, 312 F.3d 1250, 1254, 1258 (11th Cir. 2002) (refusing to review district court's conditional in limine ruling that evidence was admissible under Rule 404(b) if defendant pursued a lack-of-intent defense, because defendant did not pursue that defense and the evidence was therefore never introduced; thus, the "record [was] too minimally developed to support any meaningful review of the district court's pre-trial decision about the 404(b) evidence. Consequently, any possible harm flowing from the district court's ruling . . . is wholly speculative"); *cf. United States v. Orr*, 692 F.3d 1079, 1091 (10th Cir. 2012) (The defendant claimed that he did not ask certain questions on

**Page 40**

Peters needed to pursue damages for ongoing emotional harm if she wished to preserve her objection to the disputed evidence. Because she did not pursue her claim and the offending evidence was not admitted, we have no "factual context" in which to measure how harmful the disputed evidence would have been. *United States v. Orr*, 692 F.3d 1079, 1091 (10th Cir. 2012); *see Walden*, 126 F.3d at 519 n.10 ("[I]t is precisely because appellant comes before us not having attempted to offer evidence during the trial that we cannot rule intelligently on the underlying evidentiary questions; [s]he presents us with an abstract intellectual exercise, rife with conjecture, rather than affording us an opportunity to inspect concrete evidence, offered and excluded in an actual trial context." (internal quotation marks omitted)). Because Ms. Peters failed to preserve her objections at trial, we decline to review the court's in limine rulings.

We note that Fed. R. Evid. 103(a)(1) and (2),[7] which ordinarily govern whether an objection to an evidentiary ruling has been preserved, do not address

---

cross-examination of a government witness because the witness had not been qualified as an expert. But the defendant never posed the questions and did not seek a ruling by the trial judge on the propriety of such questions. Following *Luce*, we affirmed on appeal because "[w]ithout a 'factual context' in which to make its ruling, a reviewing court has no ability to determine what might have happened [had the evidence been admitted] . . . . In such a factual vacuum, any harm to [the defendant] is entirely speculative").

[7] Rule 103(a) provides in full:

> **(a) Preserving a Claim of Error.** A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party and:
>> **(1)** if the ruling admits evidence, a party, on the record:
>>> **(A)** timely objects or moves to strike; and

conditional rulings, and its requirements are not a good fit for such rulings.[8] Indeed, the advisory committee note to the 2000 amendment to Rule 103 states that "[n]othing in the amendment is intended to affect the rule set forth in *Luce* . . . and its progeny," and cites several cases where "[t]he *Luce* principle has been extended . . . to other situations." *See also United States v. Wilson*, 307 F.3d 596, 599–601 (7th Cir. 2002) (applying *Wilson*, 182 F.3d at 565, after the 2000 revision to Rule 103 went into effect and holding that a conditional ruling that the government could introduce defendant's invocation of his right to silence if defendant discussed his associate was not appealable because defendant chose not to discuss his associate at trial, so the disputed evidence was never elicited.).

### 2.    *Testimony regarding Ms. Culp's prior employment*

Ms. Culp challenges the district court's admission of cross-examination testimony from Joelle Recalde, a Remington employee who had also worked with Ms. Culp at Applebee's, concerning Ms. Culp's prior employment there. She claims that the testimony was inadmissible as unduly prejudicial under Fed. R. Evid. 403,

---

**(B)** states the specific ground, unless it was apparent from the context; or

**(2)** if the ruling excludes evidence, a party informs the court of its substance by an offer of proof, unless the substance was apparent from the context.

[8] For example, here the conditional ruling could be characterized as admitting evidence (since it permits the requested cross-examination), so it would seem to come within Rule 103(a)(1). But that provision does not require an offer of proof (because, of course, the challenged evidence was admitted) although a court reviewing a challenge to a conditional admission of evidence would need to examine what the parties would have presented if the condition had been satisfied.

which states that the trial court may exclude relevant evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice."

We hold that Ms. Culp did not properly preserve her objection to the testimony. Her objection and the contested testimony are reproduced below:

> **[Remington's Lawyer]:** . . . When you discovered that Ms. Culp was applying for a job at Remington, what did you tell Remington's management?
> **[Ms. Recalde]:** I specifically told Rick and Eric not to hire her because she had caused some issues at Applebee's. I said she caused some problems at Applebee's, and I said it's – it was a lot of trouble.
> **[Remington's Lawyer]:** Did you get into – at that point, did you get into specifics about what those issues or problems were?
> **[Ms. Recalde]:** Yeah –
> **[Ms. Culp's Lawyer]:** Objection. 403.
> **[Ms. Recalde]:** Yes –
> **[Ms. Culp's Lawyer]:** Objection. 403.
> **The Court:** Overruled.
> **[Remington's Lawyer]:** Continue, Ms. Recalde.
> **[Ms. Recalde]:** There was a specific instance that one of the managers that was in charge of putting the servers in sections, Stacie had accused him, of being racist because he was giving all of the Hispanic servers the better sections than the white servers. And so I had mentioned to her, I said, Well, I'm in section 2, that's a good section, and I'm white. And she said, Well, that doesn't count because you know some Spanish. That was the big one that stuck out in my mind because she was just – she caused some issues at Applebee's, and I just – it's not worth the trouble sometimes. So I told Eric and Rick not to hire her because of the problems we had.

Aplt. App., Vol. IV at 1089–90. Ms. Culp's lawyer did not reraise his objection or move to strike Ms. Recalde's answer after the fact.

The next day, before the jury was brought in, Ms. Culp's lawyer sought permission from the court to address Ms. Recalde's insinuation that Ms. Culp made a racially charged comment while at Applebee's. He wanted to elicit from Ms. Culp

that she is married to a Hispanic man and has Hispanic children. The court allowed for "very limited leeway" on the issue and explained that the objection Ms. Culp's lawyer had made to the testimony the day before had not been timely because the court could not "judge whether or not" the evidence was "more prejudic[ial] than probative" when the court did not know what the witness's answer would be. *Id.* at 1119–20. The court suggested that the lawyer could have moved to strike Ms. Recalde's answer after the fact. The lawyer then asked to strike the testimony, but the court responded that "the testimony was, what, over a day ago," and refused to consider the untimely motion. *Id.* at 1120. Ms. Culp's lawyer stated that he was confused because the court had told the lawyers "not to state speaking objections." *Id*. The court explained that moving to strike "is not a speaking objection," and "[i]f you want to do a basis for it, then you may ask to approach." *Id.* It reminded counsel: "As I told you in the trial preparation conference we are not going to have these debates in front of the jury. But if there is something on which you believe you need to make a record, you may ask to approach." *Id*.

Under Fed. R. Evid. 103(a) a party preserves an objection to the admission of evidence only if the party "timely objects or moves to strike" and "states the specific ground, unless it was apparent from the context." "[A]n aggrieved party must present his objection with clarity and specificity to the trial court in order to avoid unnecessary error from occurring[.]" *United States v. Hubbard*, 603 F.2d 137, 142 (10th Cir. 1979); *see United States v. Holloway*, 826 F.3d 1237, 1251 (10th Cir.

2016) (Objections must be "sufficiently specific to provide the district court with an opportunity to correct its action in the first instance.").

Ms. Culp's objection in no way informed the court how the witness's likely answer would be unfairly prejudicial. Any argument to that effect on appeal was not preserved. Ms. Culp's lawyer should have approached the bench and explained what testimony he feared might be elicited and why that testimony would be prejudicial to Ms. Culp. He also could have re-raised his objection and moved to strike after Ms. Recalde answered the question. Because he failed to "timely object or move to strike" the offending testimony, Ms. Culp forfeited her objection. *Burke v. Regalado*, 935 F.3d 960, 1014 (10th Cir. 2019).

Ms. Culp argues on appeal that her lawyer thought the court's bar on speaking objections also precluded him from asking to approach the bench to explain his objections. But the transcript of the trial-preparation conference confirms that the court instructed the parties to ask to approach if needed. The court said: "You are not allowed to make speaking objections. If there is an objection, simply stand, state your objection in one or two words, preferably by rule. If more is needed, *you'll need to ask to approach . . . .*" Aplt. App., Vol. IV at 1065 (emphasis added). This is common practice in the federal trial courts. *See* Robert E. Larsen, *Navigating the Federal Trial*, § 3:13 (2024 ed.) (judges may "ban speaking objections in open court when the jury is in the box," but then "should provide a reasonable alternative . . . , such as bench conferences outside the hearing of the jury so that a party's objection

**Page 45**

may be 'fleshed out' on the record"). The failure of Ms. Culp's lawyer to understand the court's procedure does not excuse him from Rule 103's mandates.

Having failed to preserve the issue in district court, Ms. Culp has waived the issue on appeal by failing to argue plain error in her opening brief. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130–31 (10th Cir. 2011).

### 3.    *The Anderson testimony*

Finally, Ms. Culp appeals the court's admission of the testimony of Leah Anderson, a Remington employee, concerning conversations she had with Ms. Culp while they were both employed at Remington. Ms. Culp objected under Fed. R. Evid. 403 and 404(b). We conclude that Ms. Culp did not preserve her objections for appeal. Ms. Culp's objections and the contested testimony are reproduced below:

> **[Remington's Lawyer]:** Tell us about the kind of conversations of – that might have been of a sexual nature that you had with Ms. Culp while you were training on the beverage cart?
> **[Ms. Culp's Lawyer]***:* Objection. 403, 404(b).
> **The Court:** Overruled.
> **[Remington's Lawyer]:** Go ahead. You can –
> **[Ms. Anderson]:** Okay. So specifically on the beverage cart, we – you know, we serve mainly men on the golf course. There is not a lot of female golfers. And there was a group of men that were about our age, you know, that obviously were asking [u]s if we were single and all of that. I had a ring on my finger, so I was not, but she didn't. And I can't remember which way it went, but either she gave her number to him or he gave his number to her, but I know by the end of the shift, they were contacting each other via text.
> **[Remington's Lawyer]:** Can you recall any other conversation about – of a sexual nature with Ms. Culp on the beverage cart?
> **[Ms. Anderson]:** Not on the beverage cart, but before that shift started – not before the shift started, but while we were in training, she mentioned that she had just got her breast enhancements done and said it would help her make tips. She asked what was appropriate to wear on the beverage cart, and I said you can wear whatever you're comfortable with. It's hot

out of there, so most of wear skirts. And so she, you know, showed up wearing a skirt and—

**[Remington's Lawyer]:** Now, were these conversations to you offensive?

**[Ms. Anderson]:** No.

Aplt. App., Vol. V at 1399–1400.

When Ms. Culp raised her Rule 403 objection, the court had no way of conducting the necessary weighing since neither the relevance (which was assumed in the objection, because the rule applies only to relevant evidence) nor the potential prejudice of the solicited testimony was obvious. The court could not know what Ms. Anderson was about to say, and Ms. Culp's counsel made no proffer of her likely testimony. By this time in the trial, the court had made it clear to counsel not once but twice that he could seek to approach the bench to educate the judge on the upcoming testimony, or he could wait to hear the testimony and then move to strike it. He did neither. The objection did not suffice to preserve the issue for appeal. It was hardly "sufficiently specific" to give the district court the necessary information to weigh the potential prejudice of the testimony against its relevance. *Holloway*, 826 F.3d at 1251 (10th Cir. 2016)**.**

Finally, we turn to Ms. Culp's objection under Fed. R. Evid. 404(b). That rule states in relevant part:

> **(b) Other Crimes, Wrongs, or Acts.**
> **(1) Prohibited Uses.** Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
> **(2) Permitted Uses.** This evidence may be admissible for another purpose, such as proving motive, opportunity, intent,

**Page 47**

preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

Courts consider the following factors when weighing whether Rule 404(b) requires exclusion of evidence: "(1) whether the evidence is offered for a proper purpose, (2) whether the evidence is relevant, (3) whether the probative value of the evidence is substantially outweighed by its prejudicial effect, and (4) whether a limiting instruction is given if the defendant so requests." *United States v. Irving*, 665 F.3d 1184, 1211 (10th Cir. 2011) (internal quotation marks omitted). "Because only one use is forbidden and several permissible uses are identified, we have characterized Rule 404(b) as illustrative, not exhaustive." *United States v. Merritt*, 961 F.3d 1105, 1111 (10th Cir. 2020) (internal quotation marks omitted). That is, "[t]he rule admits all other-act evidence except that tending to prove only propensity." *United States v. Armajo*, 38 F.4th 80, 84 (10th Cir. 2022).

Here, Remington's counsel asked about conversations with Ms. Culp that were of a "sexual nature." Aplt., App., Vol. V at 1399. Perhaps in some contexts it would be clear to the trial court that any responsive testimony to such a question could be offered only to tar the party's character. But not so in a hostile-work-environment sexual-harassment case. Such evidence may have been admissible to rebut the subjective component of Ms. Culp's hostile-work-environment claim: "[I]f the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993). "The gravamen of

any sexual harassment claim is that the alleged sexual advances were unwelcome." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986) (internal quotation marks omitted). To the extent that Ms. Anderson's testimony was offered to suggest that Ms. Culp did not perceive all sexual conversations at work to be abusive, it had a permissible noncharacter purpose.

And given that permissible purpose, the testimony could have been relevant because it tended to show that Ms. Culp did not always object to sexual conversations at work. The Supreme Court itself has recognized that "sexually provocative speech and dress" is "obviously relevant" in determining whether the alleged harassment was unwelcome. *Id.* at 69, 73. To be sure, testimony regarding Ms. Culp's conversations of a sexual nature with one female employee at Remington would be unlikely to in itself show that she was not offended by Mr. DeSalvo's advances. But evidence need not prove a proposition on its own to be probative. *See United States v. Sloan*, 65 F.3d 861, 864 (10th Cir. 1995) ("An item of evidence, being but a single link in the chain of proof, need not prove conclusively the proposition for which it is offered. It is enough if the item could reasonably show that a fact is slightly more probable than it would appear without that evidence. A brick is not a wall." (ellipses and internal quotation marks omitted)).

Thus, it could hardly have been obvious to the trial judge that testimony concerning Ms. Culp's conversations "of a sexual nature" would necessarily be improper. To preserve an objection to any of the testimony, Ms. Culp's counsel therefore needed to explain to the court why specific expected testimony should be

Page 49

prohibited by Rule 404(b) or, after the testimony was elicited, why specific testimony should be stricken. Counsel did neither. The challenge under Rule 404(b) was therefore forfeited, and the issue is waived because plain error was not argued on appeal. *See Richison*, 634 F.3d at 1130–31.

## III.    CONCLUSION

We **AFFIRM** the court's judgment on Ms. Peters's claims and on Ms. Culp's negligent-supervision claim. We **VACATE** the jury's verdict on Ms. Culp's harassment and retaliation claims and **REMAND** for a new trial on those claims.