**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 30, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

MATTHEW BYRNES,

    Plaintiff - Appellant,

v.

ST. CATHERINE HOSPITAL;
CENTURA HEALTH CORPORATION,

    Defendants - Appellees.

No. 24-3149

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 2:21-CV-02086-DDC)**
_____

Boyd A. Byers (Eric Turner, with him on the briefs), Foulston Siefkin LLP, Wichita, Kansas, appearing for Appellant.

Richard A. Olmstead, Kutak Rock LLP, Wichita, Kansas, appearing for Appellees.
_____

Before **MATHESON**, **KELLY**, and **BACHARACH**, Circuit Judges.
_____

**MATHESON**, Circuit Judge.
_____

Dr. Matthew Byrnes brought retaliation claims under Title VII of the Civil Rights Act of 1964 against his former joint employers—St. Catherine Hospital ("SCH") and Centura Health Corporation ("Centura") (collectively, "Defendants")—for firing him and

later reporting him to the Kansas medical licensing board. He alleged Defendants retaliated because he reported that another doctor working at SCH was sexually harassing nurses.

The district court granted summary judgment to Defendants on Dr. Byrnes's federal claims and declined to exercise supplemental jurisdiction over his related state law claims. Exercising jurisdiction under 28 U.S.C. § 1291, we reverse and remand.

## I.    BACKGROUND

We provide a brief factual summary and procedural history here and later discuss additional details as relevant to the issues on appeal.

### A.    *Key Participants and Factual Summary*[1]

Centura is a not-for-profit corporation headquartered in Colorado. It operates a regional healthcare network. SCH, located in Garden City, Kansas, is a Centura member hospital. Centura manages the clinical practices of SCH, including personnel matters.

Dr. Byrnes is a medical doctor licensed to practice medicine in Kansas by the Kansas Board of Healing Arts ("KBHA"). He worked as a general surgeon and intensivist at SCH from 2012 until February 12, 2020. He also served as SCH's Chief

---

[1] "Because this case arises from an appeal of summary judgment, we present the following factual background in the light most favorable to [Dr. Byrnes] as the non-moving party, unless contradicted by the record." *Litzsinger v. Adams Cnty. Coroner's Off.*, 25 F.4th 1280, 1284 (10th Cir. 2022).

Medical Officer ("CMO") from 2013 to June 2019. Centura and SCH jointly employed Dr. Byrnes.

Many individuals were involved in this case. The following played significant roles:

- Dr. William Freund, President of SCH's Medical Executive Committee ("MEC")

- Dr. Bryan Stucky, MEC Vice President and later President

- Dr. Toni Green-Cheatwood, Centura Colorado Kansas Group ("CKG") Vice President and Physician Executive

- Peter Sabey, Centura General Counsel

- Dr. Scott Lichtenberger, Centura President

- Tom Gessel, CKG Group President

- Scott Taylor, SCH Chief Executive Officer ("CEO")

- Nancy Killion, Centura Director of Quality

On August 31, 2019, Dr. Byrnes reported Dr. Kurt Kessler, a doctor working at SCH, for sexual harassment. Dr. Freund investigated. Dr. Freund, Dr. Stucky, and Dr. Green-Cheatwood informed Dr. Byrnes that his allegations lacked merit.

After receiving a subpoena from the KBHA about a complaint filed against Dr. Byrnes, Dr. Green-Cheatwood and Mr. Sabey conducted an internal investigation. They interviewed various doctors, but not Dr. Byrnes or any nurses. They reported their investigation results and Dr. Green-Cheatwood recommended firing Dr. Byrnes to Dr. Lichtenberger and Mr. Gessel, who jointly decided to fire Dr. Byrnes.

After firing Dr. Byrnes, SCH referred some of Dr. Byrnes's cases to an outside peer review committee at Centura's St. Anthony's Hospital in Colorado, which reviewed and scored Dr. Byrnes's cases. Defendants reviewed St. Anthony's findings and reported four of Dr. Byrnes's cases to the KBHA for possible disciplinary action.

## B. *Procedural History*

Dr. Byrnes's Title VII claims alleged that Defendants (1) fired and (2) unfairly reviewed and reported four of his cases to the KBHA in retaliation for the sexual harassment complaint.[2] He also brought state law claims.

Defendants moved for summary judgment. The district court found Dr. Byrnes could not meet his burden on either Title VII retaliation claim and granted summary judgment to Defendants. It also declined to exercise supplemental jurisdiction over his state law claims.

Dr. Byrnes timely appealed.

## C. *Legal Background—Title VII Retaliation*

We provide the following legal overview to aid in understanding the relevant facts, the district court's decision, the parties' arguments, and our analysis.

Title VII's anti-retaliation provision prohibits an employer from "discriminat[ing] against any individual . . . because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a).

---

[2] Dr. Byrnes also brought federal Americans with Disabilities Act claims, which are not on appeal. *See* Aplt. Br. at 3 n.1.

To survive summary judgment on a Title VII retaliation claim, a plaintiff must directly "show that retaliatory animus played a motivating part in the employment decision," or "rely on the [*McDonnell Douglas*] burden-shifting framework . . . to prove retaliation indirectly." *Parker Excavating*, *Inc. v. Lafarge W., Inc.*, 863 F.3d 1213, 1220 (10th Cir. 2017) (quotations omitted); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1225 (10th Cir. 2008) (*McDonnell Douglas* applies to Title VII retaliation claims).

The *McDonnell Douglas* framework has three steps. First, "the plaintiff must make out a prima facie case of retaliation." *Parker Excavating*, 863 F.3d at 1220. Second, the burden then shifts to the employer to "offer a legitimate, nonretaliatory reason for its decision." *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 998 (10th Cir. 2011). Third, the burden then reverts to the plaintiff to show that there is a genuine dispute of material fact as to whether the employer's proffered reason is pretextual— i.e., unworthy of belief. *Id*. at 998-99.

To establish a prima facie case of Title VII retaliation at *McDonnell Douglas* step one, "a plaintiff must show (1) that [he] engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019) (quoting *Khalik v. United Air Lines*, 671 F.3d 1188, 1193 (10th Cir. 2012)).

To establish a causal connection, a plaintiff must "show that the individual who took adverse action against [him] knew of the employee's protected activity," *Montes v.*

*Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007) (quotations omitted), and "present evidence of circumstances that justify an inference of retaliatory motive," *Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014) (quotations omitted).  In some cases, the plaintiff may need to rely on the cat's paw causation theory.  Under this theory, the biased motive of a subordinate can be imputed to the unbiased, final decisionmaker.  *EEOC v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 484-86 (10th Cir. 2006).  Thus, an employer can be liable under Title VII for retaliation when (1) a biased subordinate performs a deliberate act of retaliatory animus (2) that is intended to cause a materially adverse action, and (3) that act is a but-for cause of the adverse action, even though an impartial decisionmaker makes the ultimate choice to carry out that action.  *See Sellman v. Aviation Training Consulting*, No. 23-6138, --- F.4th ---, 2025 WL 2957951, at *6 (10th Cir. Oct. 21, 2025); *Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 516 n.8 (10th Cir. 2015).

## II.  DISCUSSION

Dr. Byrnes challenges the grant of summary judgment on his Title VII retaliation claims and the declination of supplemental jurisdiction over his state law claims.

### A.  *Termination Retaliation Claim*

We provide additional facts and procedural history relevant to Dr. Byrnes's termination retaliation claim before turning to the merits.

6

1. **Additional Factual History**

    a. *April 2019 meeting*

In April 2019, Dr. Freund, Dr. Kessler, Dr. Julie Freeman, Dr. Gretchen Dunford, and Dr. Zeferino Arroyo met with SCH CEO Taylor and asked him to fire Dr. Byrnes based on "their personal interactions with Dr. Byrnes" and "his interactions within the community." App., Vol. 6 at 1491-92. None of the doctors' concerns about "patient care" "were substantiated by any evidence." *Id.* at 1492.

    b. *CEO Taylor removed Dr. Byrnes as CMO*

In June 2019, CEO Taylor removed Dr. Byrnes as CMO because his total salary from his three SCH roles might exceed regulatory compensation caps, but not because of patient care issues.

    c. *Dr. Byrnes's complaint against Dr. Kessler*

On August 31, 2019, Dr. Byrnes filed a complaint about Dr. Kessler to Dr. Freund and Ms. Killion. He raised concerns about Dr. Kessler's handling of one type of operation, failure to wear gloves during sensitive exams, and sexually explicit comments to and touching of nurses. Dr. Byrnes based the sexual harassment allegations on reports from at least two SCH nurses, who allegedly told him about Dr. Kessler's behavior but refrained from filing complaints themselves out of fear of retaliation.

Dr. Freund showed Dr. Kessler the complaint and told him Dr. Byrnes filed it. Dr. Kessler later "rant[ed]" to Ms. Killion, *id.* at 1472, and tried to speak with the Human Resources ("HR") director about the complaint in a manner the director described as "completely inappropriate," App., Vol. 5 at 1289-90.

7

Dr. Freund and the HR director separately talked to one nurse about Dr. Kessler. The nurse told Dr. Freund that Dr. Kessler touched her in a way that was "weird and inappropriate." App., Vol. 6 at 1616-17. She did not remember the details of the conversation with HR, but the HR director stated the nurse reported nothing "inappropriate" happened and she was "not uncomfortable." App., Vol. 3 at 804. Dr. Freund substantiated the allegations about Dr. Kessler's lack of hand hygiene and found one nurse's note disagreeing with Dr. Kessler's patient care.

Dr. Freund then met with SCH's MEC and shared Dr. Byrnes's complaint. He told the MEC that he investigated the allegations. The parties dispute what information he shared about his investigation and whether he told the MEC that one or all of Dr. Byrnes's allegations were false. One attendee, Dr. Dunford, Chief of Surgery, emailed Dr. Green-Cheatwood that "[a]ll of the[] allegations [in Dr. Byrnes's complaint] were found to be false." *Id.* at 809; App., Vol. 4 at 1069-71. Dr. Freund later forwarded Dr. Byrnes's complaint to Dr. Green-Cheatwood.

In October 2019, Dr. Freund, Dr. Green-Cheatwood, and Dr. Stucky told Dr. Byrnes that "there was no merit found to any of the components" of his complaint, which was "dismissed in its entirety." App., Vol. 4 at 1042-44. Dr. Byrnes challenged the adequacy of Dr. Freund's investigation and reiterated his complaints against Dr. Kessler.

In November 2019, the MEC again discussed concerns about Dr. Byrnes's allegations and his "insistence that [he] believe[d] these allegations to be true." App., Vol. 3 at 811; *see also* App., Vol. 2 at 406 (Dr. Dunford telling Ms. Killion that she

8

thought Dr. Byrnes "seemed to be very disturbed, writing a letter like that about a colleague").

### d. *Dr. Byrnes's reappointment to the SCH medical staff*

Also in November 2019, SCH reappointed Dr. Byrnes to the medical staff. For reappointment, a physician's department chair, the MEC, and the SCH Board must consider certain factors, including "current competence"; "ability to safely and competently perform the clinical privileges requested"; "commitment to quality care"; the results of "ongoing professional practice evaluations, and other peer review activities, taking into consideration practitioner-specific information"; and "verified complaints from patients and/or staff." App., Vol. 3 at 576-77, 602-03.

Dr. Dunford, as Chief of Surgery, determined, "[b]ased upon [her] review of the applicant's education, training, experience, and evidence of current clinical competence," that Dr. Byrnes was "qualified for Medical Staff/Allied Health Staff Membership and Clinical Privileges." App., Vol. 6 at 1642. Both the MEC and SCH Board reviewed his application and approved it. CEO Taylor testified that SCH would not have entered into a new employment contract with Dr. Byrnes if it had concerns about the quality of his medical care.

### e. *The MEC's request for a psychological evaluation*

In December 2019, Dr. Freund told Mr. Sabey, Centura General Counsel, that Dr. Byrnes made "false allegations against a member of the [SCH] medical staff." App., Vol. 5 at 1188; App., Vol. 6 at 1668-70. Dr. Freund also signed a letter to Dr. Byrnes requesting that he undergo a psychological evaluation, stating the MEC "unanimously

agreed that it was in the best interest of the hospital and the medical staff to ask [Dr. Byrnes] to seek an evaluation including a psychologic [sic] assessment." App., Vol. 3 at 811.

On January 19, 2020, Dr. Byrnes responded by email to Dr. Stucky—who had since replaced Dr. Freund as MEC President—stating "Dr. Freund's letter is tantamount to retaliation against a whistleblower." *Id.* at 812-17. He restated his complaints about Dr. Kessler and demanded that the MEC retract Dr. Freund's letter. *See id.* at 815-16. Dr. Stucky forwarded Dr. Byrnes's letter to Mr. Sabey.

Two days later, Dr. Stucky emailed Dr. Byrnes stating that the MEC would retract the letter requesting his psychological evaluation.

### f. *KBHA subpoena*

On January 27, 2020, SCH received a subpoena from the KBHA demanding information about Dr. Byrnes based on an anonymous complaint filed with the KBHA against him. The complaint alleged against Dr. Byrnes:

- "multiple alarming adverse outcomes, including multiple patient deaths";

- "pressuring hospital CEO Scott Taylor to disband the hospital peer review committee";

- "an unusually high number of nicked bowels during surgeries";

- "abandon[ing] 8 [Intensive Care Unit] cases";

- "transferring out patients that he has dangerously mismanaged"; and

- "well known incidents of sexual relations in hospital treatment rooms with nurses."

10

*Id.* at 831. It also stated, "The medical staff has advised the CEO that [Dr. Byrnes] is unsafe and needs an assessment due to his erratic and [sic] behaviors and dangerous violations of the standard of care." *Id.*

g. *The January 30 Dr. Byrnes/Dr. Green-Cheatwood phone call*

On January 30, 2020, Dr. Byrnes called Dr. Green-Cheatwood to report the complaint filed against him with the KBHA. *See id.* at 824. He claimed that Dr. Kessler filed it in retaliation for Dr. Byrnes's complaint at SCH against Dr. Kessler.[3] He denied the allegations, citing his mortality rate data, surgical experience, and litigation record (two unsuccessful lawsuits against him in nearly 13 years in practice). He also told Dr. Green-Cheatwood that much of the medical staff would support him and refute the allegations.

h. *Defendants' internal investigation of the KBHA complaint*

That same day, Dr. Green-Cheatwood emailed Mr. Sabey, summarizing her eight-minute call with Dr. Byrnes. Mr. Sabey initiated an internal investigation. On February 6, 2020, Dr. Green-Cheatwood and Mr. Sabey traveled to SCH to spend one day interviewing employees. They interviewed CEO Taylor, Chief Financial Officer Amanda Vaughan, Ms. Killion, Dr. Michael Babigumira, Dr. Arroyo, Dr. Freeman, Dr. Dunford, Dr. Stucky, Dr. Freund, Dr. Kessler, and Dr. James Zauche.

---

[3] The "general perception" at SCH was that Dr. Kessler filed the anonymous complaint in retaliation for Dr. Byrnes's complaint against him. App., Vol. 6 at 1477-78; *see also* App., Vol. 3 at 820-21 (CEO Taylor forwarded the KBHA subpoena to Mr. Sabey and Ms. Killion, stating, "My understanding is this was precipitated by Dr[.] Kessler (retaliation about Byrnes' letter)").

Dr. Freeman stated in her interview that she saw Dr. Byrnes purchasing two to-go growlers of beer from a pub when she thought he was scheduled to be on call.  She did not know whether he arranged for coverage.

Dr. Dunford told the interviewers that her communication with Dr. Byrnes about coverage was not perfect, but their surgical patients were always covered, and no patient care issues resulted from imperfect communication.

Dr. Kessler and Dr. Freund told the interviewers that Dr. Byrnes, as CMO, disbanded SCH's peer review committee.

Although HR best practices and SCH procedures call for interviewing the subject of an investigation, Dr. Green-Cheatwood and Mr. Sabey did not notify Dr. Byrnes about their investigation or otherwise communicate with him.  Dr. Green-Cheatwood explained that Dr. Byrnes (1) was out of town and (2) was represented by counsel. Dr. Green-Cheatwood and Mr. Sabey coordinated schedules with other interviewed doctors and interviewed Dr. Kessler with his lawyer present.  They did not interview any nurses.

i.  *Dr. Byrnes's termination*

On February 10, 2020, Dr. Green-Cheatwood and Mr. Sabey called Dr. Lichtenberger and Mr. Gessel to report their investigation results and to recommend firing Dr. Byrnes.  After the call, Dr. Lichtenberger and Mr. Gessel jointly decided to fire Dr. Byrnes.  Dr. Lichtenberger said this decision was based on the information provided by Dr. Green-Cheatwood and Mr. Sabey.  Mr. Gessel did not recall why Dr. Byrnes was fired, who made the firing decision, or whether he was involved in discussions about it,

but "surmise[d] that Dr. Green-Cheatwood and Mr. Sabey were in support of the [termination] decision" if they were involved. App., Vol. 5 at 1204-07.

On February 12, 2020, Dr. Green-Cheatwood and Dr. Zauche told Dr. Byrnes he was fired and gave him a termination letter signed by Dr. Lichtenberger. The letter said Dr. Byrnes was fired "without cause." App., Vol. 3 at 864. Dr. Byrnes's employment agreement allowed either party to "terminate [the] Agreement for any reason or no reason" on 90 days written notice. *Id.* at 648.

j.  *Dr. Byrnes's Equal Employment Opportunity Commission complaint*

On May 1, 2020, Dr. Byrnes filed a complaint about his termination with the Equal Employment Opportunity Commission ("EEOC"). In response, Defendants said they fired him for (1) "his patient care," and (2) "his halting of the peer review process." App., Vol. 6 at 1619-20. They said, "In his role as CMO, he inappropriately shut down the normal and required processes of professional peer review within the Hospital that would have identified the deficiencies in his medical care and should have resulted in his loss of clinical privileges at the Hospital." *Id.*

k.  *KBHA complaint closure*

On September 21, 2021, the KBHA closed the investigation into the anonymous complaint against Dr. Byrnes. The KBHA had allowed Dr. Byrnes to respond to the complaint's allegations, determined no action was needed, and closed the case.

2. **Additional Procedural History**

The district court granted summary judgment to Defendants on Dr. Byrnes's Title VII termination retaliation claim, concluding he could not show his firing was pretextual.

a. *Prima facie case*

For his retaliation prima facie case, the district court said Dr. Byrnes needed to show "(1) that [he] engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." App., Vol. 7 at 1799 (alteration in original) (quoting *Bekkem*, 915 F.3d at 1267). The parties agreed that Dr. Byrnes could show the first two elements but contested whether he could show the third element—causation.

On causation, the district court said that a plaintiff normally "must first come forward with evidence from which a reasonable factfinder could conclude that those who decided to fire him had knowledge of his protected activity." *Id.* at 1800 (quoting *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008)). But the court found that Dr. Lichtenberger and Mr. Gessel—who fired Dr. Byrnes—were unaware of Dr. Byrnes's protected activity. It then analyzed whether Dr. Byrnes could satisfy the causal connection on a cat's paw theory, under which the actual decisionmakers terminated him based on information provided by biased subordinates—Dr. Green-Cheatwood and Mr. Sabey. *Id.* at 1801-05.

The district court said, "[T]o survive summary judgment when asserting the cat's-paw theory of liability, a plaintiff must show that there is a genuine issue of material fact that (1) the subordinate took action motivated by discriminatory animus; (2) the subordinate intended the action to cause an adverse employment action, and (3) the subordinate's actions proximately caused the intended adverse employment action." *Id.* at 1802 (alteration in original) (quoting *Singh v. Cordle*, 936 F.3d 1022, 1038 (10th Cir. 2019)).[4] The court assumed without deciding that Dr. Byrnes could show the first cat's paw element and found he could establish a genuine issue of material fact on the second and third. *Id.* at 1803-05. It then proceeded to step two of *McDonnell Douglas*.

### b. *Nonretaliatory reasons*

The district court concluded that Defendants offered four legitimate, nonretaliatory reasons for firing Dr. Byrnes: "(i) abandoning patients in the ICU; (ii) poorly documenting patients' status; (iii) potentially exercising poor clinical judgment; and (iv) stopping some of the peer review components in his role as CMO." *Id.* at 1806.

---

[4] The district court stated the adverse action and causation standards for Title VII discrimination claims, not Title VII retaliation claims. *Compare Singh*, 936 F.3d at 1038 (using adverse "employment" action and "proximate cause" standards for Title VII discrimination claim), *with Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006) (holding Title VII retaliation claims are "not limited to discriminatory actions that affect the terms and conditions of employment" but must be "materially adverse"), *and Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 358-63 (2013) (holding "but-for" causation applies for Title VII retaliation claims). We have said, "To establish causation where . . . a Title VII retaliation claim is based on the cat's-paw theory, a plaintiff must demonstrate that the biased subordinate was a 'but-for' cause of the adverse action." *Thomas*, 803 F.3d at 516 n.8. We therefore apply the materially-adverse-action and but-for causation standards but note that we would reach the same outcome under the adverse-employment-action and proximate-cause standards.

c. *Pretext*

The district court found that Dr. Byrnes failed to show Defendants' nonretaliatory reasons were pretextual. It rejected his pretext arguments that (1) Defendants offered inconsistent and uncorroborated reasons for firing him; (2) the temporal proximity of his renewed sexual harassment complaints to his termination created a triable issue of pretext; (3) Defendants conducted a biased, one-sided investigation; and (4) Defendants deviated from their normal policies and procedures.

First, the district court determined that, although Defendants' "various spokespersons emphasized one reason over another," "those varying emphases don't equal inconsistent reasons," and Defendants "never abandoned or affirmatively disclaimed any of their reasons." *Id.* at 1809-10 ("A given spokesperson prioritizing one reason—while still citing other reasons consistent with other spokespersons—doesn't suggest dishonesty or bad faith."). It also said Defendants' rationales were corroborated because five doctors brought concerns about Dr. Byrnes's patient care to CEO Taylor in April 2019 before Dr. Byrnes engaged in protected activity, and the decisionmakers who fired Dr. Byrnes believed he "bore responsibility for the hospital's inadequate peer review system." *Id.* at 1811-12.

Second, the district court said that the five doctors' concerns about Dr. Byrnes's patient care "emerged *before* [Dr. Byrnes]'s protected activity in August 2019," thus "mitigating against a plausible finding of pretext on temporal proximity grounds." *Id.* at 1813. "What's more," the court said, "close temporal proximity can support a finding of pretext only in combination with other evidence of pretext." *Id.* (quoting *Lobato v.*

16

*N.M. Env't Dep't*, 733 F.3d 1283, 1293 (10th Cir. 2013)).  But "no other evidence of pretext" contributed "to the requisite combination."  *Id.*

Third, the district court found that the investigation into Dr. Byrnes was not unreasonable because (1) best practices, like "considering provider data" or formally interviewing Dr. Byrnes, were not required because an investigation need not be "optimal" but merely "fair," *id.* at 1814-15 (quotations omitted); (2) Defendants' interviewing only doctors rather than nurses made "sense given that the doctors . . . likely were better placed to identify issues" with Dr. Byrnes's performance, *id.* at 1815; and (3) Dr. Byrnes was given an opportunity to provide "his version of events" during the January 30, 2020 phone call with Dr. Green-Cheatwood before the investigation began, *id.* at 1815-17 (quotations omitted).  The court said the eight-minute phone call was "the most important event" to evaluate pretext, explaining that Dr. Byrnes had the opportunity to deny the complaint's allegations, "cited specific data showing his mortality rate, recited his work experience as a surgeon, and even reviewed his litigation record."  *Id.* at 1815-16.  Dr. Byrnes thus provided "his version of events," *id.* at 1816 (quoting *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1314 (10th Cir. 2017)), weakening an inference of pretext.

Fourth, the district court said that Defendants did not deviate from their normal policies and procedures.  It found there were no written policies requiring CEO Taylor to participate in Dr. Byrnes's firing decision or requiring SCH to resolve patient care issues by speaking with Dr. Byrnes before firing him.  Further, CEO Taylor's subjective beliefs

17

about (1) policies and (2) differential treatment of Dr. Byrnes were insufficient to establish pretext by deviation from unwritten policies.

3. **Summary Judgment and the Standard of Review**

"We review the district court's summary judgment decision de novo, applying the same standards as the district court." *Iweha v. Kansas*, 121 F.4th 1208, 1220 (10th Cir. 2024) (quoting *Klein v. Roe*, 76 F.4th 1020, 1028 (10th Cir. 2023)). Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." We review the "evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Iweha*, 121 F.4th at 1220 (quoting *Forth v. Laramie Cnty. Sch. Dist. No. 1*, 85 F.4th 1044, 1052 (10th Cir. 2023)).

4. **Analysis**

Dr. Byrnes attempted to prove his Title VII retaliation claim through circumstantial evidence under the *McDonnell Douglas* burden-shifting framework. The district court analyzed each step and granted summary judgment, concluding that Dr. Byrnes could not show pretext at the third and final step.

On appeal, Defendants agree with the district court on pretext, but they also contend that Dr. Byrnes cannot show causation for his prima facie case and that we could affirm the grant of summary judgment on that alternative ground. *See* Aplee. Br. at 27-43. As a result, we review each of the *McDonnell Douglas* steps, with emphasis on

the causation element of the prima facie case and on pretext.[5] We conclude that a reasonable jury could find that Dr. Byrnes could satisfy each step of *McDonnell Douglas* on which he bears the burden. We therefore reverse the district court's grant of summary judgment on his termination retaliation claim.

a. *Prima facie case*

The parties agreed that Dr. Byrnes could meet the protected activity and adverse action elements of a prima facie case. On the causation element, he showed, under a cat's paw theory, that a reasonable jury could find that Dr. Green-Cheatwood and Mr. Sabey (1) acted with retaliatory animus when they conducted a one-sided and unfair investigation and reported their results to Dr. Lichtenberger and Mr. Gessel and (2) intended their report to lead to Dr. Byrnes's termination, and (3) their report was a but-for cause of Dr. Byrnes's termination. *See Sellman*, 2025 WL 2957951, at *6; *Thomas*, 803 F.3d at 516 n.8.

i. Protected activity

Dr. Byrnes's August 31, 2019 complaint to Dr. Freund and Ms. Killion reporting Dr. Kessler's alleged sexual harassment was protected activity under Title VII. *Fye*, 516 F.3d at 1228. Dr. Byrnes reiterated his complaint on October 16, 2019, in a meeting with Dr. Freund, Dr. Stucky, and Dr. Green-Cheatwood. And in his January 19, 2020 letter to Dr. Stucky, he "st[ood] by [his] initial whistleblower complaint," providing

---

[5] In addition, because Dr. Byrnes proceeds on a cat's paw theory, analysis of the prima facie causation and pretext issues substantially overlaps.

additional information regarding the allegations. App., Vol. 3 at 813, 815.[6] By

reiterating his earlier allegations of sexual harassment against Dr. Kessler, Dr. Byrnes

"communicate[d] to [his] employer that the employer ha[d] engaged in . . . a form of

employment discrimination." *Crawford v. Metro. Gov't of Nashville*, 555 U.S. 271, 276

(2009); *see also Walkingstick Dixon v. Oklahoma ex rel. Reg'l Univ. Sys. of Okla. Bd. of

Regents*, 125 F.4th 1321, 1340 (10th Cir. 2025).

### ii. Materially adverse action

Dr. Byrnes's termination on February 12, 2020, was a materially adverse action.

*See, e.g.*, *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 (10th Cir.

2006) ("[A]ny reasonable employee would have found termination materially adverse.").

### iii. Causal connection

As noted above, to survive summary judgment on a cat's paw theory, Dr. Byrnes

must show a reasonable jury could find that (1) Dr. Green-Cheatwood and Mr. Sabey

took action motivated by retaliatory animus, (2) they intended the action to cause a

---

[6] Dr. Byrnes stated that the purpose of his January 19 letter was "not to re-register [his] original complaint about Dr. Kessler," but he "reiterated why [his] original complaint was valid" and "obtained three letters from medical and nursing personnel that can attest to Dr. Kessler's behavioral issues" with two additional letters "still pending." App., Vol. 3 at 816. Construed in the light most favorable to Dr. Byrnes, this supplementation to his sexual harassment allegations was protected activity. *See Fye*, 516 F.3d at 1228 ("[P]rotected opposition can range from filing formal charges to voicing informal complaints to superiors." (quotations omitted)); *Walkingstick Dixon v. Oklahoma ex rel. Reg'l Univ. Sys. of Okla. Bd. of Regents*, 125 F.4th 1321, 1340 (10th Cir. 2025) ("An employee who repeats a complaint of unlawful discrimination 'resist[s]' the discrimination just as much as an employee who makes a novel complaint. Also, Ms. Walkingstick added 'detail[s]' to her initial complaint." (citations omitted)).

materially adverse action, and (3) their action was a but-for cause of the intended adverse action. *See Sellman*, 2025 WL 2957951, at *6; *Thomas*, 803 F.3d at 515, 516 n.8.

### 1) Retaliatory animus

Retaliatory animus may be shown by evidence of pretext, *Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1218 (10th Cir. 2003), and "[a] failure to conduct what appeared to be a fair investigation of the violation that purportedly prompted adverse action may support an inference of pretext," *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 542 (10th Cir. 2014) (quotations omitted).  Dr. Byrnes has made a sufficient showing to support an inference of pretext, satisfying the cat's paw first element.

First, the most glaring deficiency in Defendants' investigation was their failure to interview Dr. Byrnes.  Interviewing him would have followed HR best practices and SCH's standard procedures.  Dr. Green-Cheatwood's justifications for not interviewing him—difficulty coordinating schedules and Dr. Byrnes's representation by counsel—ring hollow.  They did not prevent her from coordinating schedules with other SCH doctors or interviewing Dr. Kessler with his lawyer present.

Second, Defendants' argument that interviewing Dr. Byrnes would not have changed the results of the investigation is unpersuasive.  They argue that, even if they had interviewed him, "[t]here is nothing Dr. Byrnes could possibly have said to discredit Dr. [Freeman]'s *eyewitness testimony* observing Dr. Byrnes 140 miles away from SCH while he was on call in the ICU" or "to refute Dr. [Freeman]'s first-hand account of Dr. Byrnes's patients who were left unattended by a physician for two days because Dr. Byrnes left town without signing over their care."  Aplee. Br. at 34-35.

21

But the evidence was mixed. As Dr. Freeman acknowledged, signing out is not a formal process and often is orally communicated. She was unaware if Dr. Byrnes arranged coverage for these days or if he had approval to be out of town. Dr. Dunford admitted that her communication with Dr. Byrnes was not perfect, but as the only two surgeons, they always ensured patients were covered. She also stated no patient care issues resulted from imperfect communication.[7]

Defendants could have clarified whether Dr. Byrnes arranged for coverage on these dates by asking him directly, but they chose not to.[8] *See Ibrahim v. All. for Sustainable Energy, LLC*, 994 F.3d 1193, 1200 (10th Cir. 2021) (inferring pretext when

---

[7] Defendants cite Dr. Green-Cheatwood's and Mr. Sabey's notes from interviews of three other doctors to argue patient abandonment. *See* Aplee. Br. at 15. But the record shows a genuine issue of material fact. First, Dr. Dunford's testimony that she and Dr. Byrnes always ensured patients were covered and no patient care issues resulted from imperfect communication contradicts the notes. Second, Dr. Babigumira stated he could not reach the intensivist but did not say he was trying to reach Dr. Byrnes. Third, Dr. Arroyo's statement about Dr. Byrnes—"ICU Intensivist care is ok. There to provide extraordinary services, but he's not there. I tell myself 'this is fraud,'" App., Vol. 3 at 845-46—can be read as patient abandonment only if we construe his ambiguous statement to mean Dr. Byrnes was not physically in the ICU. On summary judgment, we must view the evidence in the light most favorable to Dr. Byrnes, not Defendants.

[8] The record indicates other interviewed doctors also could have talked about Dr. Byrnes's arranging coverage but were not asked. For example, Dr. Babigumira, a nephrologist who "work[ed] closely with intensivists" like Dr. Byrnes, said his interview was "brief," in part because he told them "he's a good guy, he's a good doctor," which he did not feel were the answers they were looking for. App., Vol. 4 at 978-81. He provided more information in his deposition, including that he would sometimes cover the ICU for Dr. Byrnes and was unaware of any "situations where [Dr.] Byrnes left and didn't have any coverage lined up." *Id.* at 983.

employer asked employee a direct question but did not give him an "opportunity to explain" and rather made a negative inference about him).[9]

Third, Dr. Byrnes was "never given the benefit of the doubt during the investigation. Rather, [Defendants] seemingly relied only on evidence to the detriment of [Dr. Byrnes] and failed to interview key witnesses." *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1160 (10th Cir. 2008). For example, Dr. Lichtenberger said, based on witness interviews, "[I]t sound[ed] like there w[ere] a lot of periods where nurses in ICU tried to contact Doctor Byrnes [but] were not able to get ahold of him. That to me alone is a terminable offense. You can't abandon your patients." App., Vol. 1 at 285. But no nurses were interviewed.[10]

---

[9] During their investigation, Dr. Green-Cheatwood and Mr. Sabey also could have asked Dr. Byrnes whether he dropped any components of SCH's peer review program when he was CMO, one of the reasons Defendants later gave for firing him. *See* App., Vol. 1 at 285. Instead, they relied on the recollection of others, such as Dr. Kessler and Dr. Freund, and on Dr. Green-Cheatwood's "assum[ption]" that Dr. Byrnes "was responsible for ensuring properly functioning peer review." Aplee. Br. at 14. The investigation's inadequacy became even more apparent when Ms. Killion later testified that Dr. Byrnes never interfered with SCH's peer review process and CEO Taylor testified that no one person could shut down peer review and that either he or Ms. Killion recommended having the MEC take peer review responsibility.

[10] Defendants argue Dr. Byrnes never "identified any specific person for Dr. Green-Cheatwood or Mr. Sabey to interview as part of their investigation," Aplee. Br. at 36-37, but (1) Dr. Byrnes did not know Defendants were investigating him, and (2) Defendants never interviewed him or asked him for specific names.

The district court said that Defendants' "decision to interview doctors, instead of nurses, makes sense given that the doctors—in light of their expertise and experience—likely were better placed to identify issues with [Dr. Byrnes]'s performance as a doctor." App., Vol. 7 at 1815. But Dr. Lichtenberger said one reason for firing Dr. Byrnes was that *nurses* could not get a hold of Dr. Byrnes while he was on call.

In sum, a reasonable jury could find that Dr. Green-Cheatwood and Mr. Sabey's investigation into Dr. Byrnes was unfair and biased. *See Smothers*, 740 F.3d at 543. Dr. Byrnes therefore presented sufficient evidence to create a genuine dispute of material fact on pretext, which supports an inference of Dr. Green-Cheatwood and Mr. Sabey's retaliatory animus under a cat's paw theory.

### 2) Intent

Dr. Byrnes has shown that Dr. Green-Cheatwood and Mr. Sabey intended their report to Dr. Lichtenberger and Mr. Gessel to cause Dr. Byrnes's termination. *See Sellman*, 2025 WL 2957951, at *6. Dr. Green-Cheatwood said she based the recommendation to fire Dr. Byrnes on the interviews, and Mr. Sabey testified that the "whole point of conducting an investigation" was to provide information for the actual decisionmakers to rely on. App., Vol. 2 at 327. The district court correctly concluded that both "drew a straight-line between the action of engaging in the interview process and firing" Dr. Byrnes, thus satisfying the cat's paw second element. App., Vol. 7 at 1804.

### 3) But-for cause

Dr. Byrnes has shown that Dr. Green-Cheatwood and Mr. Sabey's report was a but-for cause of his termination. "The key element of a successful cat's paw theory of pretext is an unbroken causal chain connecting the biased employee's action to the unbiased decisionmaker's adverse decision." *Sellman*, 2025 WL 2957951, at *6 (quoting *Iweha*, 121 F.4th at 1228); *see also Lobato*, 733 F.3d at 1294 ("[A] necessary element to

a subordinate bias claim is the decisionmaker's uncritical reliance on facts provided by a biased supervisor." (alterations adopted and quotations omitted)).

"A cat's paw theory can be defeated by showing a break in the causal chain, or a lack of uncritical reliance by the unbiased decisionmaker," *Iweha*, 121 F.4th at 1228, such as an unbiased decisionmaker "conducting an independent investigation of the allegations," *BCI Coca-Cola*, 450 F.3d at 488.  The unbiased decisionmaker "affording the employee-plaintiff an opportunity to explain h[is] side of the dispute" may "bolster its argument that it conducted an independent investigation."  *Iweha*, 121 F.4th at 1229; *see also Thomas*, 803 F.3d at 516.

Dr. Green-Cheatwood and Mr. Sabey's investigation and report were an unbroken causal chain to Dr. Lichtenberger and Mr. Gessel's decision to fire Dr. Byrnes.

First, Dr. Lichtenberger said he relied on Dr. Green-Cheatwood and Mr. Sabey's report in making his firing decision.  And Mr. Gessel, who could not recall who decided to fire Dr. Byrnes or why, "surmise[d]" that Dr. Green-Cheatwood and Mr. Sabey supported firing Dr. Byrnes.  App., Vol. 5 at 1204-06.

Second, neither Dr. Lichtenberger nor Mr. Gessel independently investigated the allegations against Dr. Byrnes.  Nor did they afford Dr. Byrnes the opportunity to explain his side of the story.[11]  *See Iweha*, 121 F.4th at 1229.  Indeed, Dr. Lichtenberger did not

---

[11] The district court said Dr. Byrnes gave his version of events when he called Dr. Green-Cheatwood on January 30, 2019, to tell her that he believed Dr. Kessler filed the anonymous KBHA complaint in retaliation for his sexual harassment complaint and that all of the KBHA complaint's allegations were false.  *See* App., Vol. 7 at 1815-16 (noting this "single phone call" was "the most important event for the court to evaluate pretext").  This finding was incorrect.

even know whether Dr. Green-Cheatwood and Mr. Sabey interviewed Dr. Byrnes but "assumed" they did. App., Vol. 1 at 287; *see Smothers*, 740 F.3d at 542-43 (holding a reasonable jury could find an unfair investigation when the decisionmakers "personally spoke with [the biased subordinate]" but "[n]one heard [the plaintiff]'s version of the encounter" and thus "ultimately relied on one-sided information and accepted [the bias subordinate]'s allegations and negative characterizations").[12]

The record thus supports that Dr. Lichtenberger and Mr. Gessel uncritically relied on Dr. Green-Cheatwood and Mr. Sabey's investigative report and "reached their conclusions about what transpired based on one-sided information—then fired

---

First, Dr. Byrnes initiated the eight-minute phone call before Defendants began their internal investigation against him. *See* App., Vol. 3 at 824.

Second, Defendants stipulated that they never interviewed Dr. Byrnes as part of their investigation. App., Vol. 1 at 194.

Third, Dr. Byrnes did not speak with the final, unbiased decisionmakers. Dr. Byrnes's telling his side of the story to Dr. Green-Cheatwood—one of the alleged biased subordinates—who then provided the results of a one-sided and unfair investigation to the final decisionmakers, does not negate an inference of pretext. *See Iweha*, 121 F.4th at 1228-29 (noting that "whether the plaintiff was afforded an opportunity to explain her side of the story to the unbiased decisionmaker" can support that the employer conducted an independent investigation and "did not uncritically rely on another's discriminatorily biased allegations"); *Lobato*, 733 F.3d at 1294 ("[I]f the employer independently verifies the facts and does not rely on the biased source—then there is no [cat's paw] liability.").

[12] Defendants' reliance on *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108 (10th Cir. 2007), at oral argument (they did not cite *Riggs* in their brief) is unavailing. In *Riggs*, although the employer did not ask the plaintiff to "complete her side of the story" after it "learned the full extent" of a customer's complaint, we held this was not a "disturbing procedural irregularity" tending to show pretext because the plaintiff had already explained what happened shortly after the incident occurred. *Id.* at 1119 (quotations omitted). By contrast, Defendants did not interview Dr. Byrnes at all, and their investigation concerned much more than a single incident.

26

[Dr. Byrnes] based largely on those tenuous conclusions." *Smothers*, 740 F.3d at 543.

A reasonable jury therefore could find Dr. Green-Cheatwood and Mr. Sabey's bias was a

but-for cause of the intended adverse action, satisfying the cat's paw third element. *See*

*Sellman*, 2025 WL 2957951, at *6.

\* \* \* \*

Dr. Byrnes established a prima facie case on his termination retaliation claim

under a cat's paw theory.

### b. *Nonretaliatory reasons*

Defendants posited "legitimate, nonretaliatory reason[s]" for the adverse action.

*Twigg*, 659 F.3d at 998. Dr. Lichtenberger said he fired Dr. Byrnes because he had

(1) abandoned patients in the ICU; (2) provided poor documentation and potentially poor

clinical judgment; and (3) stopped some of the peer review components. Defendants met

their "exceedingly light" burden. *Montes*, 497 F.3d at 1173 (quotations omitted).

### c. *Pretext*

At this point, the burden shifts back to the plaintiff to show there is at least a

genuine dispute of material fact as to whether "the employer's reason was merely a

pretext for retaliation." *Parker Excavating*, 863 F.3d at 1220. Dr. Byrnes did so.

We typically "assess pretext by looking at the final result of the disciplinary

process, not the acts or motives of those who may be in the decision-making chain.

However, if the final decisionmaker merely relies on possibly biased reports or

conclusions of others, rather than conducting an independent investigation, our focus

shifts back to the [biased subordinate]." *Macon v. UPS, Inc.*, 743 F.3d 708, 715

27

(10th Cir. 2014).  Because Dr. Byrnes may proceed on a cat's paw theory, our focus moves from the actual decisionmakers—Dr. Lichtenberger and Mr. Gessel—back to the biased subordinates—Dr. Green-Cheatwood and Mr. Sabey.

As discussed above, Dr. Green-Cheatwood and Mr. Sabey's unfair investigation shows pretext.  *Smothers*, 740 F.3d at 542 ("A failure to conduct what appeared to be a fair investigation of the violation that purportedly prompted adverse action may support an inference of pretext." (quotations omitted)).

Dr. Byrnes also presented evidence of temporal proximity to show pretext. Aplt. Br. at 48-50; *see Lobato*, 733 F.3d at 1293 ("[C]lose temporal proximity can support a finding of pretext only in combination with other evidence of pretext.").  Only three weeks passed between Dr. Byrnes's January 19, 2020 informal complaint letter— his "last instance of protected activity," *EEOC v. PVNF, LLC*, 487 F.3d 790, 804 (10th Cir. 2007)—and his February 12, 2020 termination.  Dr. Byrnes's termination thus "closely follow[ed]" his protected opposition, creating an inference of pretext.  *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999).

In combination, Defendants' unfair investigation and the temporal proximity of Dr. Byrnes's last instance of protected activity to his termination would allow a reasonable jury to conclude that Dr. Lichtenberger and Mr. Gessel's purported reasons for firing him were pretextual.

\*     \*     \*     \*

We reverse the district court's grant of summary judgment on Dr. Byrnes's termination retaliation claim.

28

B. *Report-to-the-KBHA Retaliation Claim*

We again provide additional facts and procedural history as relevant to Dr. Byrnes's retaliation claim based on SCH's reporting his cases to the KBHA.

1. **Additional Factual History**

a. *Peer review process*

On January 29, 2020, Dr. Green-Cheatwood proposed a case review process that would send SCH cases to other Centura facilities with high-functioning peer review committees. Under this proposal, all SCH charts from the past two years that met certain criteria would be reviewed. But after her call with Dr. Byrnes on January 30, Dr. Green-Cheatwood proposed reviewing Dr. Byrnes's cases from the past five years using slightly different criteria.

O're Berry, the Quality Improvement Coordinator at St. Anthony's Hospital in Colorado, another Centura facility, reviewed the SCH cases and identified the ones meeting certain criteria, such as complications, returns to surgery, and mortalities. She then sent those cases to Dr. Stucky, who selected which cases to refer for outside peer review. He relied on Dr. Green-Cheatwood's recommendations on surgical cases.

Once SCH referred a case, outside peer review committees at two Centura hospitals, including the St. Anthony's committee led by Dr. Rebecca Vogel, reviewed it. Based on that review, the case would be assigned one of the four standard-of-care ("SOC") ratings under Kansas medical regulations. *See* Kan. Admin. Regs. § 28-52-4(a); App., Vol. 2 at 479-80. Two of those levels require mandatory reporting to the KBHA.

Kan. Admin. Regs. § 28-52-4(b).[13]  The following chart summarizes these standards and

reporting requirements:

| Kansas Standards of Care | Mandatory Reporting to the KBHA? |
|---|---|
| SOC 1:  Standards of care met | NO |
| SOC 2:  Standards of care not met, but with no reasonable probability of causing injury | NO |
| SOC 3:  Standards of care not met, with injury occurring or reasonably probable | YES |
| SOC 4:  Possible grounds for disciplinary action by the appropriate licensing agency | YES |

After a peer review committee evaluated a case, it would report any adverse

findings to SCH.  SCH would review the cases that received adverse findings and send

mandatory reporting cases to the KBHA or, "[i]f there was an opportunity for a

remediation or a further collegial intervention, then that was communicated with the

physician in question."  App., Vol. 5 at 1409-10.  The following flow chart sets forth the

peer review process steps:

---

[13] Under Kansas regulations, "[s]eparate standard-of-care-determinations shall be made for each involved provider" and "[a]ny incident determined by the designated risk management committee to meet category [SOC 3] or [SOC 4] shall be . . . reported to the appropriate licensing agency."  Kan. Admin. Regs. § 28-52-4(b).

**Step 1**:
Identify Possible Cases for Peer Review
(*O're Berry, St. Anthony's Quality Improvement Coordinator*)

↓

**Step 2**:
Select Cases to Refer for Peer Review
(*Dr. Stucky with input from Dr. Green-Cheatwood*)

↓

**Step 3**:
Peer Review Cases and Report Findings to SCH
(*St. Anthony's Peer Review Committee led by Dr. Vogel*)

↓

**Step 4**:
Review Findings and Determine Next Steps
(*SCH largely through Dr. Stucky*)

Although St. Anthony's peer review process was intended to be anonymous, Dr. Green-Cheatwood asked Dr. Vogel to conduct a "personal" review—outside of the peer review committee—of at least one of Dr. Byrnes's cases, specifically identifying him as the doctor.  App., Vol. 6 at 1542-44.

  b.  *Results of the peer review process and report to the KBHA*

    i.  Dr. Byrnes's cases

Although Defendants fired Dr. Byrnes on February 12, 2020, SCH reported four of his cases to the KBHA—one on September 28, 2020, and three more on January 12, 2021.  On the first submitted case, a 2015 thyroidectomy, the peer review committee identified "[m]inor improvement opportunit[ies]" for Dr. Byrnes.  App., Vol. 8 at 1949-50, 1953-55 (quoted in the parties' briefs).  Construing the evidence in the light

most favorable to Dr. Byrnes, we view this case as a non-mandatory reporting case.[14]  On

that same case, Dr. Byrnes's co-surgeon, Dr. Joanne Rink, was not reported to the

KBHA.  SCH did not ask Dr. Byrnes to respond to the four adverse findings.

> ii.  Dr. Gottschalk's cases

When Dr. Stucky referred Dr. Byrnes's cases for peer review, he also referred

multiple cases of another surgeon, Dr. Lionel Gottschalk.  The outside peer review

committee at St. Anthony's identified "significant" improvement opportunities on three

---

[14] Under Kansas regulations, only SOC 3 and 4 cases must be reported to the KBHA.  *See* Kan. Admin. Regs. § 28-52-4(b).  "Minor" improvement opportunity cases, such as the 2015 thyroidectomy, must be reported as SOC 3 only if (1) the standard of care was not met and (2) injury occurred or was reasonably probable.  *See id.* § 28-52-4(a)(3); *see also* App., Vol. 2 at 481.

As Dr. Byrnes notes, no evidence showed that any SOC rating was assigned to the 2015 thyroidectomy.  Aplt. Reply Br. at 29.  He also argues the peer reviewers found a "minor" improvement opportunity because "they could not tell from the records they reviewed whether the standard [of care] was met."  *Id.* at 30.

Although Defendants argue this was a must-report SOC 3 case, Aplee. Br. at 61-62 (citing App., Vol. 8 at 1954-55), the heavily redacted peer review document they cite does not resolve (1) whether Dr. Byrnes's care was below standard or (2) whether injury occurred during the surgery.

First, the document does not reveal a standard-of-care determination.  Dr. Joanne Rink, co-surgeon on the case, said that Dr. Byrnes met the standard and that she would have reported him if he had not.

Second, the document does not reveal an injury.  Dr. Rink said that the 2015 thyroidectomy "patient experienced nerve damage" which is a "known risk or complication" of this surgery, App., Vol. 6 at 1614, and which she did not describe as an injury.  At their depositions, Dr. Arroyo and Dr. Green-Cheatwood mentioned an injury occurring in a Dr. Byrnes thyroid surgery, but neither specifically identified the 2015 surgery.

Although the deponents may have had the 2015 thyroidectomy in mind, and although an unredacted peer review document may have told us more about the standard of care and injury, on this record, a reasonable jury could find the 2015 thyroidectomy was not a mandatory reporting case and that SCH reported it to the KBHA.

of Dr. Gottschalk's cases, which Dr. Vogel said "could be classified as a [SOC] 3 or 4,

. . . [and therefore] reportable under the Kansas Board of Healing Arts."  App., Vol. 2

at 480.  Rather than reporting these SOC 3 or SOC 4 cases to the KBHA, SCH allowed

Dr. Gottschalk to respond to the adverse findings.   After his response and further review,

SCH concluded these cases were SOC 2:  "Moderate improvement opportunities.

Standards of care not met, but with no reasonable probability of causing injury."  App.,

Vol. 6 at 1728-30.

The record shows a genuine dispute of material fact as to whether Defendants

reported any of Dr. Gottschalk's SOC 2 cases to the KBHA.[15]  Construing the evidence

in the light most favorable to Dr. Byrnes, we must accept that Defendants rated all three

of Dr. Gottschalk's cases as SOC 2 and did not submit any of these cases to the KBHA

because they were not mandatory reporting cases.

### iii. Dr. Rink's cases

Although Ms. Berry initially screened some cases of Dr. Rink, a former SCH

surgeon, the record is unclear whether Dr. Stucky referred any of these cases for outside

---

[15] In January 2021, Defendants reported four doctors to the KBHA:  Dr. Byrnes (three cases), Dr. Kessler (one case), Dr. Robert Morren (one case), and Dr. Nathan Strandmark (one case).  SCH's Director of Quality and Patient Safety testified that the case "initially reported for Dr. Strandmark . . . was a mistake and that that report should have been submitted with regard to a different doctor, Dr. Lionel Gottschalk."  App., Vol. 2 at 487.  Defendants then corrected their mistake and resubmitted Dr. Gottschalk's case to the KBHA.  The record does not indicate the SOC rating of Dr. Gottschalk's reported case.

peer review. It is undisputed, however, that none of Dr. Rink's cases were reported to the KBHA, including the 2015 thyroidectomy.

      c. *KBHA closure*

On August 3, 2022, the KBHA closed the investigations into all four of Dr. Byrnes's reported cases. For three of them, the KBHA "recommended that the treatment [he] provided adhered to the applicable standard of care." App., Vol. 6 at 1660-62. The KBHA chose not to take action on the fourth case and closed it.

2. **Additional Procedural History**

The district court granted summary judgment to Defendants on Dr. Byrnes's Title VII report-to-the-KBHA retaliation claim. At step one of *McDonnell Douglas*, it found the first two elements of a prima facie case—Dr. Byrnes's protected activity (sexual harassment complaint and EEOC complaint)[16] and materially adverse action (report to a state licensing board)—were undisputed. On the third element—causal connection—the court said Dr. Byrnes "must adduce evidence capable of supporting a reasonable finding that a desire to retaliate against him for his complaints about Dr. Kessler" motivated Defendants "to adopt retaliatory processes when they decided to report his cases to [the] KBHA." App., Vol. 7 at 1824. It found he failed to do so.

The district court found that the peer review committee had no knowledge of Dr. Byrnes's protected activity. It rejected his argument that Drs. Stucky and Green-Cheatwood, rather than the peer review committee, were the actual

---

[16] Dr. Byrnes does not rely on his EEOC complaint as protected activity on appeal.

decisionmakers because "choosing which cases to place before a committee at an outside facility" is not the same as "deciding how appropriate or egregious those cases were." *Id.* at 1825.

The district court then analyzed whether Dr. Byrnes could proceed under a cat's paw theory, viewing the peer review committee as the actual decisionmaker and Drs. Stucky and Green-Cheatwood as the biased subordinates. It found that Dr. Byrnes did not present "any evidence to show the doctors exercised anything beyond influence or input in the decisionmaking process." *Id.* "To be sure, deciding which cases a committee reviews constitutes influence. But it doesn't *cause* the committee to find those cases were handled so poorly or inappropriately that they must report them to [the] KBHA." *Id.* In addition, the court said that because the peer review committee members functioned outside the SCH hospital, this "casts doubt" on Drs. Stucky and Green-Cheatwood's "ability to manipulate the committee." *Id.* at 1825-26.

Finally, the district court rejected that Dr. Green-Cheatwood's revealing Dr. Byrnes's identity to Dr. Vogel—the St. Anthony's peer review committee chair— showed causal connection because "one person's sole knowledge—when a group is deciding something—isn't sufficient to establish the requisite causation." *Id.* at 1826.

The court thus concluded Dr. Byrnes failed to establish a prima facie case of retaliation based on Defendants' reporting four of his cases to the KBHA. It did not analyze steps two and three of *McDonnell Douglas*.

3. **Analysis**

The district court analyzed only the first *McDonnell Douglas* step—prima facie case—and determined Dr. Byrnes could not establish a causal connection between his protected activity and the materially adverse action.

On appeal, Defendants agree with the district court on causation, but they also contend that Dr. Byrnes cannot establish pretext under *McDonnell Douglas* step three and that we could affirm the grant of summary judgment on that alternative ground. *See* Aplee. Br. at 59-62. We thus examine the *McDonnell Douglas* factors, with particular emphasis on causation and pretext, to determine if summary judgment was appropriate. *See Piercy v. Maketa*, 480 F.3d 1192, 1199-1200 (10th Cir. 2007).[17] After addressing each *McDonnell Douglas* step below, we reverse the district court's grant of summary judgment on this claim.

   a. *Prima facie case*

      i. Protected activity

As noted above, Dr. Byrnes's reporting Dr. Kessler's alleged sexual harassment was protected activity under Title VII. *Fye*, 516 F.3d at 1228.

      ii. Materially adverse action

We agree with the district court that reporting four of Dr. Byrnes's cases to the KBHA was a materially adverse action. "An employer action is materially adverse if 'it

---

[17] As with the termination retaliation claim, the analysis of causation and pretext on this claim overlaps.

well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Culp v. Remington of Montrose Golf Club, LLC*, 133 F.4th 968, 977 (10th Cir. 2025) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

The KBHA "regulates and licenses medical doctors in Kansas." *Corder v. Kan. Bd. of Healing Arts*, 889 P.2d 1127, 1130 (Kan. 1994) (citing Kan. Stat. Ann. § 65-2801 *et seq*.); *see also Hodes & Nauser, MDs, P.A. v. Stanek*, 551 P.3d 62, 67 (Kan. 2024) (en banc) ("The Kansas Board of Healing Arts has long regulated licensed clinicians . . . and the care they provide at medical offices . . . ."). It may revoke, suspend, or limit a doctor's medical license. *See Hodes & Nauser*, 551 P.3d at 70 ("A licensee's medical license may be revoked, suspended, or limited upon a finding that the licensee has committed an act of unprofessional conduct." (citing Kan. Stat. Ann. § 65-2836(b))).

As one court has recognized, "It is difficult to see how threatening to report Plaintiff to the state licensing board, who presumably has the ability to revoke Plaintiff's license and thus impede his ability to work in his profession, could not be an adverse employment action." *Bogden-Cozmuta v. Granby Urgent Care, LLC*, No. 20-CV-879, 2022 WL 4585442, at *7 (D. Conn. Sept. 29, 2022).

Here, Defendants did more than threaten to report Dr. Byrnes—they reported four of his cases, which "well might" dissuade "a reasonable worker from making or supporting a charge of discrimination." *Culp*, 133 F.4th at 977 (quoting *BNSF*, 548 U.S. at 59).

iii. Causal connection

As noted above, Dr. Byrnes must "show that [1] the individual who took adverse action against [him] [2] knew of the employee's protected activity," *Montes*, 497 F.3d at 1176 (quotations omitted), and [3] present "evidence of circumstances that justify an inference of retaliatory motive," *Ward*, 772 F.3d at 1203 (quotations omitted). Dr. Byrnes presented sufficient evidence to make both showings.[18]

1) Who took adverse action

Critical to the causal connection inquiry is who reported Dr. Byrnes's four cases to the KBHA. The district court found it was the outside peer review committee. We disagree. A reasonable jury could find that SCH, acting largely through Dr. Stucky and Dr. Green-Cheatwood, took the adverse action.

First, Dr. Stucky's description of the peer review process at his deposition supports this conclusion:

- Ms. Berry identified all cases between 2018 and 2020 for every SCH doctor—and, at Dr. Green-Cheatwood's direction, all cases between 2015 and 2020 for Dr. Byrnes—that met certain criteria, such as a return to the operating room, mortality, or a significant unexpected outcome;

- Dr. Stucky, with input from Dr. Green-Cheatwood on surgical cases, selected the cases to send to peer review;

- The peer review committee reviewed the selected cases, evaluated and scored them, identified areas for improvement (e.g., "significant" or "minor" improvements), and informed SCH of adverse findings; and

---

[18] Unlike the district court, we do not see the causation issue on this claim as calling for a cat's paw analysis.

- SCH reviewed the adverse finding cases and sent mandatory reporting cases to the KBHA or, "[i]f there was an opportunity for a remediation or further collegial intervention, then that was communicated with the physician in question."

App., Vol. 5 at 1407-10. Dr. Green-Cheatwood confirmed with Dr. Vogel, chair of St. Anthony's peer review committee, that SCH will manage the reporting requirements.

Second, the record shows Dr. Stucky's continual involvement in the peer review process and in deciding which SCH cases to report to the KBHA. For example, an internal Centura report detailing a retrospective review of the quality of care at SCH stated that, since February 2020, Dr. Stucky served as the conduit between SCH medical staff and the outside peer reviewers and that he was given the authority to sit on the peer review committees.

Dr. Stucky chaired or co-chaired the SCH committees that reviewed the peer review committees' adverse case findings and determined what action to take. In his co-chair role, he approved lowering three of Dr. Gottschalk's cases flagged by the peer review committee as "significant improvement opportunities" (SOC 3 or SOC 4) to "moderate improvement opportunities" with "no reasonable probability of causing injury" (SOC 2) and did not report these SOC 2 cases to the KBHA.

### 2) Knowledge

Dr. Stucky and Dr. Green-Cheatwood were aware of Dr. Byrnes's protected activity—they informed Dr. Byrnes in October 2019 that his allegations against Dr. Kessler lacked merit. Dr. Byrnes's January 19, 2020 letter to Dr. Stucky reiterated and supplemented his sexual harassment allegations against Dr. Kessler. And Dr. Stucky

39

testified that in January 2020, he and the MEC "still had concerns about the fact that Dr. Byrnes had levied . . . this complaint against Dr. Kessler." App., Vol. 5 at 1438-39.

### 3) Retaliatory motive

Although "protected conduct closely followed by adverse action may justify an inference of retaliatory motive," *Marx v. Schnuck Mkts., Inc.*, 76 F.3d 324, 329 (10th Cir. 1996), Dr. Byrnes does not rely on temporal proximity. Instead, he presented sufficient "additional evidence," in the form of pretext evidence, justifying "an inference of retaliatory motive." *Proctor v. UPS*, 502 F.3d 1200, 1209 (10th Cir. 2007); *see also Wells*, 325 F.3d at 1218 (considering evidence of pretext in analyzing the causation element of a prima facie case of retaliation under Title VII). Pretext may be shown by evidence that Dr. Byrnes "was treated differently from other similarly-situated employees who violated work rules of comparable seriousness." *Smothers*, 740 F.3d at 539 (quotations omitted).

As discussed above, Dr. Stucky allowed Dr. Gottschalk to respond to cases flagged by the peer review committee for mandatory reporting. But Defendants did not afford Dr. Byrnes the same opportunity. In addition, Defendants reported to the KBHA at least one of Dr. Byrnes's cases—the 2015 thyroidectomy—that they were not required by law to report, despite not reporting any of Dr. Gottschalk's SOC 2 cases. The only distinctions between the two surgeons evident from the record were that Dr. Gottschalk

was currently employed at SCH and Dr. Byrnes was not,[19] and Dr. Byrnes had engaged in protected activity and Dr. Gottschalk had not.

Defendants also treated Dr. Byrnes differently from Dr. Rink, who was the co-surgeon with him on the 2015 thyroidectomy case. Like Dr. Byrnes, Dr. Rink no longer worked at SCH during the peer review process. But Defendants reported the 2015 thyroidectomy to the KBHA as to Dr. Byrnes but not Dr. Rink. The record does not show that only Dr. Byrnes's care "deviated below standard" for this procedure, despite Kansas regulations stating that "[s]eparate standard-of-care-determinations shall be made for each involved provider." Kan. Admin. Regs. § 28-52-4(b).[20]

Based on the foregoing, a reasonable jury could conclude that Defendants' purported reasons for reporting Dr. Byrnes's cases to the KBHA were pretextual. Dr. Byrnes "has therefore satisfied the causation element of a prima facie case for purposes of summary judgment," and we may "examine the remaining *McDonnell Douglas* factors to determine if summary judgment was appropriate." *Piercy*, 480 F.3d at 1199-1200.

---

[19] Defendants argue that any peer review policies would not apply to Dr. Byrnes because he was not, at the time of review, "Medical Staff granted privileges to practice at St. Catherine Hospital," App., Vol. 6 at 1636, or a physician "granted clinical privileges at Centura hospitals," *id.* at 1687. But the policies do not limit a case review to doctors currently working for Defendants.

[20] Dr. Green-Cheatwood also may have treated Dr. Byrnes differently in the peer review process by (1) reviewing his cases for the past five years but all other doctors' cases for the past two years; (2) applying slightly different selection criteria to Dr. Byrnes's cases; and (3) revealing his identity to Dr. Vogel, chair of St. Anthony's peer review committee, for at least one case.

b.  *Nonretaliatory reason*

Defendants argued below that they had a legitimate, nonretaliatory reason for reporting Dr. Byrnes's cases because each case "scored as SOC 3 or SOC 4, thus mandating the reports to be filed with the KBHA."  App., Vol. 2 at 250.  Defendants met their "exceedingly light" burden.  *Montes*, 497 F.3d at 1173 (quotations omitted).

c.  *Pretext*

On its face, Defendants' proffered reason is unworthy of belief because at least one of Dr. Byrnes's cases did not require mandatory reporting but was reported anyway.  In combination with Defendants' treating Dr. Byrnes and similarly-situated surgeons differently, Dr. Byrnes presented sufficient evidence of pretext to withstand summary judgment.  *See Smothers*, 740 F.3d at 539.

\*     \*     \*     \*

We reverse the district court's grant of summary judgment on Dr. Byrnes's report-to-the-KBHA retaliation claim.

## C.  **State Law Claims**

We review "a denial of supplemental jurisdiction for abuse of discretion."  *Brown v. City of Tulsa*, 124 F.4th 1251, 1272 (10th Cir. 2025) (quoting *Nielander v. Bd. of Cnty. Comm'rs*, 582 F.3d 1155, 1172 (10th Cir. 2009)).  When a federal district court has jurisdiction, the court "shall have supplemental jurisdiction" over related claims that "form part of the same case or controversy" under Article III of the United States Constitution.  28 U.S.C. § 1367(a).  But a district court may decline to exercise

42

supplemental jurisdiction if it has dismissed all claims over which it had original jurisdiction. *Id.* § 1367(c)(3).

The district court had jurisdiction over Dr. Byrnes's Title VII claims under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1331. It declined to exercise supplemental jurisdiction over his state law claims after dismissing his Title VII and other federal claims. Because we conclude that the district court erred in dismissing Dr. Byrnes's Title VII claims, we reverse and remand for the court to reconsider whether to exercise supplemental jurisdiction. *See, e.g.*, *Brown*, 124 F.4th at 1273 (remanding for district court to reconsider exercising supplemental jurisdiction over state law claim after reversing dismissal of federal claim); *Greer v. Dowling*, 947 F.3d 1297, 1304 n.5 (10th Cir. 2020) (same); *Baca v. Sklar*, 398 F.3d 1210, 1222 n.4 (10th Cir. 2005) (same).

## III.  **CONCLUSION**

We reverse and remand for further proceedings.[21]

---

[21] We grant Dr. Byrnes's unopposed motion to file Volume 8 of the appendix under seal.